# Burke *v.* Roper.

*Bill in Equity for Dissolution of Private Charitable Association, Account, and Distribution of Funds.*

1. *Charitable trusts; what are, and jurisdiction of equity over.*—A charitable trust, as known and recognized at common law, and sustained by courts of equity, was public in its nature, and the persons to be benefited by it were vague, uncertain, and indefinite, until designated as the beneficiaries for the time being; and where a common fund is created by voluntary contributions, its benefits being restricted to members of the association, it can not be considered a charitable trust, nor subject as such to be controlled by a court of equity.

2. *Voluntary charitable associations; jurisdiction of equity on ground of partnership.*—The jurisdiction of equity over such voluntary associations and their funds can not be sustained on the ground of partnership, since the members, whatever may be their relation or liability to third persons *inter sese;* there is no mutual participation in profits or loss, no authority to bind or assign the common property, and no dissolution wrought by the death of a member.

3. *Same; considered as trusts.*—The jurisdiction of courts of equity over such voluntary associations and their funds is maintained, independent of the statute of uses, or of any prerogative power, on the ground of the trust nature of the fund, the charitable uses for which it is designed, and the inadequacy of legal remedies.

4. *Same; jurisdiction to decree dissolution, and distribution of funds.* When the operations of such voluntary associations have been discontinued, its objects and purposes being abandoned by common consent, a court of equity has jurisdiction to decree a dissolution, and to distribute the common fund among the several contributors in proportion to the amount contributed or paid by them respectively.

5. *Same.*—A new association being formed on the dissolution of the old, composed of some of the members with other persons, members of the same church, and made subject to such laws and restrictions as the church might prescribe; while an unauthorized dismissal of some of the members, by the arbitrary act of the minister in charge, without a trial or hearing, might afford grounds for legal proceedings to compel their restoration, such nugatory act would not authorize a court of equity, at their instance, to decree a dissolution of the association, or a distribution of the common fund among the members.

APPEAL from the Chancery Court at Mobile.

Heard before the Hon. JOHN A. FOSTER.

The bill in this case was filed by William H. Roper and others, members of the Stone Street Baptist Church (colored) in Mobile, and also of two charitable associations organized among the members of said church; against Benjamin Burke, the pastor of the church, Hal Campbell and others, trustees of said associations, and other members who adhered to them, and against the partners composing the banking-house of Thos. P

[Burke v. Roper.]

Miller & Co.; and prayed an account of the funds belonging to said associations in the ·hands of said· bankers, and a distribution thereof among the several parties in interest. The bill was filed by the complainants "in behalf of themselves and such others as are entitled to participate in the moneys hereinafter mentioned, and whose rights are denied by the defendants," and contained these allegations:

(1.) In 1872, the complainants and others, members of said church, "formed and organized a society for the mutual benefit of such persons as should join therein and contribute to the funds to be raised," called the "Relief Treasury óf the Stone Street Baptist Church;" the object and purpose of which was, " to create a fund for the purpose of nursing and caring for its members while sick, providing for them a means of support and the necessary maintenance and medical attention during illness, and to bury such of said members as should die from time to time." (2.) Each member of the society paid fifty cents on his admission, and twenty-five cents each month afterwards; and with the funds thus realized, the society paid all its expenses, defrayed all the charges incident to its organization and purposes, and accumulated a fund of about $3,000, on deposit in the hands of Thos. P. Miller & Co., besides lending over $600 to the church. (3.) In 1882, "it was found that a number of the members of the society were largely in arrears in the payment of their monthly dues, and it was thought by the society that it would be impossible for them to pay up the amounts they were in arrears; and for the purpose of continuing the association without further loss to such members as were unable to contribute to the funds thereof, and, at the same time, of placing the funds already on hand in such a position that those members who were in arrears should not lose the benefit of their previous contributions, it was agreed that said amount then on hand and due to said society should be deposited for their mutual benefit; but no stipulation whatever was made as to the future use that should be made thereof." About $3,000 of said sum is now on deposit with said Thos. P. Miller & Co., and the sums borrowed by the church are still due and unpaid, with interest. (4.) "After said sum was so deposited with said Thos. P. Miller & Co. as a closed transaction, the majority of the members of said association formed themselves into a new body, called the *New Relief Treasury of the Stone Street Baptist Church;* but said new society was composed of the members of the former society, and was organized for the same purposes, and managed by the same trustees, and on the same principle as the former society;" a copy of the resolutions, treated by them as a constitution or charter, being made an exhibit to the bill. (5–6.) The new organization

[Burke v. Roper.]

prospered, and on July 26th, 1884, had accumulated about $800, which was on deposit with said Thos. P. Miller & Co.; but the trustees had deposited it in their names as trustees of the church, instead of the society. (7.) A discussion arose in the society "as to debarring some of the old and decrepit members belonging to said societies from any participation in the funds which had accumulated;" said Benjamin Burke, the pastor, insisting on " debarring all those who, from age or disease, were unable to continue their contributions," while complainant Roper and others opposed him. Burke became offended on account of this opposition, " and from that time on began to make insinuations and cast reflections upon said Roper, both in the meeting of the body and in the pulpit; and on one occasion, when said Roper looked at other complainants and smiled, he became highly offended, and summoned said Roper before a meeting of the congregation of the church, to answer for said offense." (8.) At said meeting, Roper not having made a satisfactory apology, " and demanding a fair trial of the matter under the rules of the church, said Burke declined to give him such a trial, and submitted it to a vote of the congregation, as to whether he should expel said Roper. Upon such vote, a majority of the congregation voted in favor of said Roper; and thereupon said Burke announced, that said Roper, and all others who voted to sustain him, were from that time dismissed from the church, and should not be permitted to participate in the benefits of the property belonging to the church, nor in the benefits derived from the accumulation of said fund by said societies." Since that time, complainants and the others so expelled have received no benefit from the fund, and have not been recognized by said Burke and his associates, who claim to have control and management of said funds, and deny that complainants have any rights or interest therein; and Thos. P. Miller & Co. refuse to account to or with either party, until the matter is adjusted by the courts. The bill therefore prayed, " that it be referred to the register to ascertain and report the amount of the funds belonging to said two religious associations, and to require the defendants to account for the same; and also to ascertain and report who are the parties entitled to said funds, and what portion thereof each is entitled to; and that the court will, on the coming in of the report, decree the amount of said fund, and the proportion thereof due to each of complainants, and to such other persons as may be shown to be entitled to participate therein; and will cause the said funds to be paid into court by said Thos. P. Miller & Co., and to be equitably distributed among the parties entitled thereto;" and for other and further relief, under the general prayer.

[Burke v. Roper.]

Burke and his associates filed a demurrer to the bill, assigning the following grounds of demurrer: (1.) The bill shows that complainants have no interest or property in the funds under the control of these defendants, and they show no right to the relief prayed. (2.) As to the parties named in an exhibit to the bill, and alleged to be members of the relief societies, the complainants show no right to represent them. (3.) The bill, with the exhibits, shows that all the contributions "have gone into a common treasury, and that this court has no authority to compel the society, through these defendants or T. P. Miller & Co., to refund the money so contributed." (4.) The facts stated as to the trial of Roper, the expulsion of him and others, and the subsequent declarations of Burke, do not furnish any ground for equitable relief. (5.) The bill does not show that the complainants ever sought relief from the church, or offered to pay their monthly dues after their expulsion; nor does it appear that they have not, by delinquency in payment of their monthly dues, forfeited all right to participate in the benefit of the relief fund. (6.) Complainants show that they participated for many years in the benefits of said society, down to the time when they ceased to pay their dues; and they have thereby waived all right to call these defendants to account as to these matters. (7.) The moneys in the hands of T. P. Miller & Co. constitute a trust fund, which is specially dedicated to a particular purpose, and is under the control of an organized body, either the church or the relief society named, neither of which is made a party to the bill. The chancellor overruled the demurrers, and his decree is now assigned as error.

D. C. ANDERSON & SON, for appellants, cited the following cases: *Burdine v. Grand Lodge,* 37 Ala. 481; *Morton v. Smith,* ·5 Bush, Ky. 467; *Mears v. Moulton,* 30 Md. 142; *Penfield v. Skinner,* 11 Vermont, 296; *Beaumont v. Meredith,* 3 Vesey & B. 180; *Thomas v. Ellmaker,* 1 Parson's Sel. Cases, 98.

G. L. SMITH, *contra,* cited Perry on Trusts, §§ 160, 885; Hill on Trustees, 185, 519; *Esterbrook v. Tillinghast,* 5 Gray, 17; *Platt v. Williams,* 2 McLean, 308; *Robbins v. Battle House Co.,* 74 Ala. 504; Story's Eq. Pl., § 497.

CLOPTON, J.—"The Relief Treasury of the Stone Creek Baptist Church" is an unincorporated association, organized for the purposes of nursing and caring for sick members, providing necessary maintenance, and medical attention during illness, and of burying such as should die from time to time. The common fund was created by initiation fees and monthly

contributions. Such fund is not a charitable trust, as recognized and known under the common law, and sustained by courts of equity. The requisites to such trusts are, that they must be public in their nature, and the persons to be benefited must be vague, uncertain, and indefinite, until designated as the particular beneficiaries for the time being. A common fund, created by voluntary contributions, the benefits being restricted to the members of the association, has not, ordinarily, been considered a charitable fund, subject to be controlled by a court of equity.—2 Perry on Trusts, § 710.

The purposes and objects of the society are praiseworthy and benevolent. Such association is organized for private charity, intended to raise a fund for the mutual benefit and assistance of the members, which is impressed with a trust character, and is placed at the disposal, and subject to the management, of persons who sustain a fiduciary relation. Such associations have become common, and can not be excluded from the domain of jurisprudence, without a conceded inadequacy of the law and the courts to enforce and protect substantial rights, to encourage the amelioration of the ills of humanity, and to foster the cultivation of the highest virtue. The right of the members to sue, in respect to matters pertaining to, or affecting their individual interests, has been repeatedly asserted.—*Means v. Moulton,* 30 Md. 142; *Anon.,* 3 Atk. 276; *Penfield v. Skinner,* 11 Vt. 296; *Lloyd v. Loaring,* 6 Vesey, 773.

Such voluntary associations, not having any well defined legal *status,* have been considered and treated by learned jurists, under the pressure of necessity, as partnerships. In *Beaumont v. Meredith,* 3 Ves. & Beames, 180, in respect to a society for the relief of the members in sickness, Lord Eldon says: "This society can be considered, in this court, only as a partnership, and neither has nor can have a corporate character." The question in the case involved the necessary parties to a suit brought by some members against the trustees, for an account, alleging an unauthorized dissolution. It has also been held, that the members, in their relations to third persons, are to be regarded as partners, the same as individuals associated for any business enterprise.—*Rabb v. Reed,* 3 Rawle, 151. There is no mutual participation of profit or loss; the death of a member does not operate a dissolution; and the members, as such, have no authority to bind or assign the common property. Whatever may be their relation and liability to third persons, they are not partners *inter sese.*—*Thomas v. Ellmaker,* 1 Par. Sel. Cas., 98. The jurisdiction of courts of equity, in such cases, must be founded on principles and relations more consonant with the purposes and intentions of the members.

[Burke v. Roper.]

The doctrine of charitable trusts is recognized, accepted, and administered in this State, in a modified and limited form; reasonable certainty as to the uses being required, and the doctrine of *cy pres* having been rejected. The jurisdiction, which a court of equity exercises over such trusts, is held to be independent of the "statute of uses," or any prerogative power of the court, and to rest on its original and inherent power to sustain such trusts, because of their charitable uses, which would be otherwise held void.— *Williams v. Pearson*, 38 Ala. 299. On account of their nature, and the peculiar means employed to carry out their purposes, it may be impracticable for a court of equity to control, enforce and execute some of the main and ultimate uses and objects of a voluntary association ; but this is not a sufficient reason why the common fund should be exempt from the control of courts of equity. The jurisdiction may be safely and consistently rested on the original and inherent power of the court to uphold and execute trusts generally, and to sustain trusts for private charity, because of their charitable uses, though the association may be voluntary, and the trust may be regarded as executory in part, by reason of the accumulations of the common fund by voluntary contributions in the future. Trustees may be held to account ; the perversion of the fund to foreign and unauthorized uses may be prevented, and its proper appropriation enjoined. Such fund may be regarded, in legal contemplation, as a trust fund for private charity, subject to be controlled *as such* by courts of equity, on the general principles of the equitable doctrine relating to a public charitable trust, as now qualified and limited ; but modified by the rules which ordinarily govern private express trusts, so far as applicable and capable of enforcement. The ground of jurisdiction is the trust nature of the fund, and its charitable use, and the inadequacy of legal remedies.

The bill alleges, that the association had accumulated a large sum by contributions, three thousand dollars of which were deposited with the banking-house of T. P. Miller & Co., which still remain on deposit, and the balance was loaned to the church, which is still unpaid. It having been ascertained, in 1882, that a number of the members had become so largely in arrears that it would be impossible for them to pay the past monthly dues, it was agreed, for the purpose of continuing such association without loss to those who were able to contribute, and of placing the fund in a position that those in arrears might not lose the benefit of their previous contributions, that the amount on hand should be deposited for their mutual benefit, without stipulation as to the future use of the fund. Thereafter, a majority of the members organized a new association, under the name of the "New Relief Treasury of the

members of the Stone Creek Baptist Church;" the two associations having no connection with, or relation to each other, as organized societies. Admitting the allegations of the bill, which, of course, are taken as true on demurrer, the first association ceased all operations about three years before the filing of the bill; its purposes were abandoned, and the accumulated fund has been preserved for the mutual benefit of the contributors, but has not been devoted to the charitable uses. Generally, when the objects of a private express trust fail, the subject-matter of the trust reverts to the donor. The objects and uses of the association having entirely failed, and its operations being discontinued, a court of equity has jurisdiction to declare it dissolved, and to distribute the fund among the contributors to whom it reverts, in the proportion of the amounts respectively contributed.

The new association occupies a different position. From the constitution, a copy of which is appended as an exhibit to the bill, it appears that the members of the church are members of the association. Its officers are confined to the "Deacon Board," appointed by, and subject to such restrictions and laws as may be prescribed by the church. It is an organization within, incidental to, and controlled by the church. Conceding the allegations of the bill, the conduct of the pastor is inexcusable—a usurpation of arbitrary power, to dismiss complainants and others from the church and the association, without a hearing and trial, and contrary to a vote of a majority of the members. Such dismissal is nugatory, and is not sufficient cause for distribution of the fund. No action has been had by the association, or by the church. The operations of the association have not ceased, nor have its objects entirely failed. So long as it is in existence, and continues its authorized operations, no member has the right to withdraw the amount contributed by him. If either of the complainants has been illegally deprived of his rights of membership, or ousted of his functions as trustee, it may be that, on proper proceedings, he would be restored and reinstated; but, on the case made by the bill, the fund raised by the new association can not be distributed among the members.

The want of necessary parties, and multifariousness, are not assigned as causes of demurrer, and are not considered nor determined.

The fourth cause of demurrer should have been sustained. As to the other causes, the demurrer, going to the entire bill, was properly overruled. The decree will be accordingly amended, and as amended affirmed. Let the costs of appeal in the Chancery Court be divided.