### INDUSTRIAL TRUST COMPANY *vs.* MANUEL GREEN *et als.*

Dissensions in a mutual benefit association culminated in a disorderly vote expelling the president from his office. In this action, although irregular, the president seems to have acquiesced. Subsequently a meeting was called by him at which the members present voted to dissolve the society and distribute its fund. The call for this meeting did not state its object, and was not signed by the officer recognized as president by the society.

*Held*, that neither the improper vote of expulsion nor the proceedings at the irregular meeting dissolved the association, and that its funds still were held by it for its purposes.

Whether the association is to be considered a partnership or not is, in the circumstances of the case at bar, not decided.

BILL OF INTERPLEADER.

*January* 30, 1892.   STINESS, J.   In January, 1889, certain Portuguese residents of this State formed a voluntary mutual benefit association, adopted a constitution, and carried on the work of their organization, after the ordinary manner of such societies, in the accumulation of a fund for the relief of the sick, and the payment of an assessment in case of death. The fund was deposited in the Industrial Trust Company, in the name of the association, by the members of its deposit and finance committees, to be withdrawn only upon orders signed by said committees, and countersigned by the president of the society. The respondent, Manuel Diaz, was president of the society for the year 1890. In February, 1890, a proposition was made that regalia be obtained for the officers, for a parade about to take place at New Bedford, which was voted down; whereupon some of the officers provided regalia at their own expense, in which they appeared at the parade. This action of the officers was regarded by some of the members as contrary to the expressed will of the society in the vote above referred to, and also to the constitution, which provided that no officer or member should appear with the society in the street except in the uniform adopted by the society. At that time no uniform except a cap and badge had been adopted. The matter caused ill-feeling in some members towards the president, who was held to be responsible for the proceeding, and at the next meeting, when the minutes of the previous meeting were read, objection was made that there was no mention therein of the regalia worn by the officers at New Bedford. The president ruled

that the subject was out of order at that time, but it might be called up later. This ruling aroused great excitement and confusion, some of the members shouting, " Put that man out of the chair." A motion was then made that the president be expelled from the chair immediately, which motion the president, after protesting that the constitution provided only for the trial of officers upon written charges, put to vote and it was carried. He then declared the result and retired from the chair, the vice-president taking his place. The disorder immediately subsided and the president remained, took part in the rest of the meeting without further objection, and also participated in several following meetings; not, however, at any time, claiming his right to the chair.

Prior to this time application had been made to the legislature for a charter for the society, under the same name, which was granted March 6, 1890. The president and others were named as corporators, who, on March 10, 1890, organized thereunder, but the charter was not presented to the original society for its acceptance. After that time the president and his friends ceased to attend the meetings of the original association, and finally claimed that the association had become dissolved, by reason of the illegal conduct above referred to, and that the fund here in question should be distributed *pro ratâ* among the members.

The contention is, that the expulsion of the president from his office was illegal, and such a breach of the contract of organization as to constitute sufficient ground for a dissolution of the society; and that such an organization is to be treated in law as a copartnership, which will be dissolved by the unauthorized and wilful exclusion of a member from participation in its affairs and privileges. It is clear that such organizations, by reason of the mutual, contractual relations of the members, are not public charities, but private associations, in some respects resembling partnerships. Nevertheless they are not strictly partnerships. Formerly, when such associations were more of a novelty than now, it seems to have been thought that every organized body must either be a corporation or a partnership. So in *Thomas* v. *Ellmaker*, 1 Parsons' Select Cases, 98, and in *Gorman* v. *Russell*, 14 Cal. 531, it was held that voluntary associations for mutual relief are partnerships;

but more recently the contrary doctrine has been held. *La Fond* v. *Deems*, 81 N. Y. 507; *Burke* v. *Roper*, 79 Ala. 138; *Ash* v. *Guie*, 97 Pa. St. 493; *Otto* v. *Journeymen Tailors*, 7 Amer. State Rep. 156, 160, note; Lindley on Partnership, *50.

This subject is fully considered in a note to *Ebbinghousen* v. *Worth Club*, 4 Abb. N. C. 300, where the distinction between internal and external controversies is pointed out, and cases cited showing when members may be regarded as partners *inter se* and as to third parties. It is needless to pass upon this question of the *status* of the parties in this case, since, assuming the standpoint of the retiring members, that it is to be treated as a partnership, we do not think a sufficient cause is shown to warrant a judgment of dissolution of the society.

The president was not excluded from his membership in the society, but only from his occupation of the chair. The vote expelling him from his office was clearly irregular, and contrary to the by-laws of the society. To this extent the action was illegal, and subversive of the mutual agreement. A majority is not omnipotent. A minority has certain equal rights which cannot be ignored. These rights are determined by the nature and rules of the association, and they may be so violated by those in power as to sunder the bonds of the association itself. It is a well-settled rule, however, both as to partnership and societies, that courts should not interfere in the dissensions of members for occasional breaches of agreements which are not so grievous as to make it impracticable for the relations to continue, and the purposes of the association to be carried out. *Gorman* v. *Russell*, 14 Cal. 531; *Fischer* v. *Raab*, 58 How. Pr. 221. Improper action due to excitement, bad temper, and ignorance will sometimes occur, but, as stated in *La Fond* v. *Deems*, *supra*, attempt should first be made for redress in the association itself. "For," to quote the language of *Gorman* v. *Russell*, *supra*, "it does not follow, if the majority of this association have mistaken their powers or duties, and acted under such mistake, if they are willing to correct the error, that a court of equity will necessarily grant the relief sought" by dissolution.

In the present case the president did not seek redress for the wrong done to him. He neither sought to take the chair at a sub-

sequent meeting, nor to have the vote rescinded ; nor for a trial under the constitution ; nor to enforce his right to his office at law. Under the expression of the will of the society, he left the chair, and apparently acquiesced in the proceedings. He not only did not assert his own right to the office of president, but recognized and submitted to the authority of the vice-president, who was acting in his place. At a subsequent meeting a vice-president was elected to fill the vacancy so caused, without protest on the part of Dias.

It is now claimed that on account of the numbers and the bitterness of feeling of those who opposed him, the result of a conspiracy to oust him, he could not make further protest without causing disorder and personal violence, but the testimony fails to establish this. We find no sufficient evidence of a conspiracy to oust him. There was disorder in the meeting for a short time, but after that, and at subsequent meetings, the proceedings of the society were quiet and orderly. In view of his acquiescence at the time, we do not think the action taken, irregular and illegal as it was, can now be made the ground for a dissolution. To apply the rule contended for on his part, suppose a copartner had been excluded, not from his share in copartnership effects, nor from participation in its affairs, but from some function which had been assigned to him by agreement, in a manner contrary to the agreement, and he had acquiesced in his deposition, giving his copartners then to understand that he treated it as they did, a proper procedure, up to a time when he found it convenient to withdraw. Surely he could not then claim the illegal displacement, of itself, to be a sufficient ground for dissolution. Many things may be done improperly by an association, but if its members acquiesce in them and go on as though they were right, they will be bound by them. Although this society had no right to displace the president in the way which was taken, and although he protested that it was not in accordance with the by-laws, yet his putting the vote and then submitting to the will of the majority must be taken as a voluntary abandonment or resignation of his office, presumably for the sake of promoting peace and harmony, which he regarded as of more importance than his personal right. But whatever the motive, the acquiescence was so complete as to amount to a waiver of

the illegality of the proceeding. On this point see *Peyre* v. *Mutual Relief Society*, 27 Pacific Reporter, 191.

The subsequent meetings show that the wrong done was not of such a character as to prevent the society from going on, with all its members, to carry out the objects for which it was instituted, and so not a ground for its dissolution now.

The respondents, represented by Mr. Dias, also claim that in October, 1890, the society voted to dissolve, and to divide the fund among the members. It appears that twenty members, pursuant to a provision of the constitution, united in a request to Dias, as president, to call a special meeting of the society for business of great importance. Dias gave notice of this meeting by the publication of a notice to all members, at which meeting a vote for the dissolution of the society and the distribution of the fund was passed. To the validity of this vote there are objections. The notice did not specify the purpose of the meeting. *Atlantic De Laine Co.* v. *Mason*, 5 R. I. 463, 471. The notice was not signed by the person who was recognized by the society as president at the time, or who, so far as the society had reason to know, still claimed to be the president of the society. In our opinion the vote relied on was ineffectual to dissolve the society.

The retiring members, here as claimants of a portion of the fund, having failed to show that the association has been dissolved, or sufficient ground upon which its dissolution should be decreed, and the voluntary association being still in existence for the objects for which it was instituted, it follows that the fund must go to the voluntary association as now constituted, to be held for the uses and purposes thereof.

*Nicholas Van Slyck & Cyrus M. Van Slyck*, for complainant.

*Augustus S. Miller & Arthur L. Brown*, for the respondents, Dias and the incorporated Portuguese Beneficial Association of Rhode Island.

*George J. West*, for the other respondents, including the voluntary association, the " *Associacão Portugueza de Beneficencia.*"