### In re TIDEWATER COAL EXCHANGE.

(District Court, S. D. New York. July 7, 1921.)

No. 809.

**1. Bankruptcy ⚖️70—Coal exchange an "unincorporated association" within Bankruptcy Act.**

The Tidewater Coal Exchange, an association organized by shippers of bituminous coal during the war with Germany, at the instance of the Council of National Defense, for the purpose of speeding the transshipment of coal from cars to ships at tidewater, etc., involving a general pooling arrangement for coal, with debit and credit charges against and for each member, *held* an "unincorporated company" within Bankruptcy Act, § 4b (Comp. St. § 9588), so as to give the District Court jurisdiction of an involuntary petition against it.

**2. Bankruptcy ⚖️88(2)—Debtors of alleged bankrupt cannot be heard in opposition to petition.**

Debtors of an alleged bankrupt cannot be heard as objectors to an involuntary petition against such bankrupt.

In Bankruptcy. In the matter of the Tidewater Coal Exchange, bankrupt. On objection to the jurisdiction of the court. Overruled, and further hearing directed.

See, also, 274 Fed. 1011.

A petition in bankruptcy was filed by three persons alleging themselves to be creditors of the Tidewater Coal Exchange asking an involuntary adjudication against this association. Certain parties, claiming an interest in the

---

result, intervened and objected to the adjudication on the ground that the alleged bankrupt was not an "unincorporated company" within the meaning of section 4b of the Bankruptcy Act (Comp. St. § 9588). The facts were stipulated and are as follows:

On June 20, 1917, at the instance of the Council of National Defense, certain shippers of bituminous coal to eastern tidewater ports formed an association known as the "Tidewater Coal Exchange." Its general purpose was to speed the transshipment of coal from cars to ships at tidewater ports and so to release the average number of cars held up. These shippers agreed that all their shipments should be pooled in common at the ports, and deliveries made to ships out of the pool; they being credited with all coal received by the Exchange and debited with all coal shipped on their consignments. The affairs of the Exchange were managed in accordance with rules duly promulgated and by an executive committee of eleven persons elected by the members for one year, and the chief executive was a commissioner. The expenses of the Exchange were paid by the carriers, but the members agreed to pay the carriers the amount assessed against them for freight charges, under the authority of the commissioner. The Exchange hired many employees, and the total cost of operating was over $800,000. It established a system of coal classification, reducing the previous 900 classes to about 50, under which the coal was all consigned and shipped.

At the outset no member was allowed to ship more than the amount of coal he had in the pool, but this system was subsequently changed, and from time to time the commissioner allowed members to withdraw a larger quantity of coal than had arrived, and they thus became debit members of the Exchange. Similarly, those who had shipped more coal than had been delivered, on their consignment, were credit members. It so came about that the pool did not contain enough coal to answer all the claims of all members.

Besides the members, any shipper of coal might deal with the Exchange on the same terms as members, and after the control of the carriers by the Director General, all shippers of coal to tidewater were in fact compelled to ship in this way, since they could not get cars unless they agreed to the pool. The total quantity of coal thus passing through the Exchange amounted to over 72,000,000 tons, or about 1,500,000 carloads.

On the 10th day of April, 1920, the Exchange was incorporated under the laws of Delaware, and the corporation took over and conducted the same business from that date, until it was closed on April 30, 1920.

The status of the objectors here does not definitely appear. In the opinion they are assumed to be creditors, although the record seems rather to put them in the position of debtors.

James F. Curtis, of New York City, for petitioning creditors.
Peale & McLaughlin, of New York City, for objectors.

LEARNED HAND, District Judge (after stating the facts as above). [1] Both parties approach this question from a mistaken point of view, in my judgment. They seem to suppose that an association must be an entity, recognized by the law as a legal person, in order to fall within the phrase "unincorporated company." This is not in the least necessary, and if it were, I should find my jurisdiction extremely doubtful at best. "Associations" in our law have always had a tenuous and ambiguous status. Even partnerships, which are uniformly treated as persons in the civil law, remain with us composed of the separate partners, who are only co-owners of the firm property, and joint obligors of the firm debts. Nor has the Bankruptcy Act under the somewhat blind provisions of section 5g succeeded in this respect in shaking the extreme conservation of our law. Francis v. McNeal, 228 U. S. 695, 33 Sup. Ct. 701, 57 L. Ed. 1029, L. R. A.

1915E, 706. To the creation of a person vested with rights and bound by obligations, there is always necessary, so far as I know, some fiat of the state, and such procedural changes as those provided by sections 1919–1922 of the New York Code of Civil Procedure have not done more than change the method by which the joint property of the members may be reached. Even for that purpose there is no integration of the liabilities into a single corporate obligation, but the plaintiff must prove that all the members are liable. McCabe v. Goodfellow, 133 N. Y. 89, 30 N. E. 728, 17 L. R. A. 204.

But the relations between the members are one thing, and means of winding up the joint venture another. It needs no change in the legal relations between the members—internally among themselves, or collectively against outsiders—to give a court power to take over the joint assets, both chattels and choses in action, and finally to dissolve the association. Nor would that be outside the scope of the bankruptcy section of the Constitution if Congress chose to do it. Dissolution proceedings of such associations have been undertaken before this by courts of equity, either as trusts or partnerships, or without any explicit ground. Burke v. Roper, 79 Ala. 138; Henry v. Jackson, 37 Vt. 431; Hodgson v. Baldwin, 65 Ill. 532; Re Printers, etc., Soc. (1899) 2 Ch. Div. 184. If section 4b of the Bankruptcy Act means that such associations shall be adjudicated, there is no objection to taking over the whole tangled congeries of rights into this court, transferring them into the hands of a trustee, through him collecting such claims as the members may have as joint obligees, and distributing the whole amount in accordance with the terms of the fundamental agreement of organization. And there is a great procedural advantage in doing so.

It cannot be reasonably doubted that by the words "unincorporated company" Congress did mean to include some sorts of such associations, and the only cases have so held which have dealt with the question at all. Re Order of Sparta (D. C.) 238 Fed. 437; Id., 242 Fed. 235, 155 C. C. A. 75 (C. C. A. 3d); Re Associated Trust (D. C.) 222 Fed. 1012; Re Seaboard Fire Underwriters (D. C.) 137 Fed. 987. No case has been or is likely to be close to another, but the only matter which has been debated, and, as I understand it, the only one here in debate, is whether the phrase "unincorporated company" is to be applied generally to all such associations, or whether the choice of the word "company" indicates a more restricted purpose, and if so, what that is. While I am struck with the force of the contrast between the unlimited use of that phrase and the specific limitations added to the word "corporation" (Cleage v. Laidley, 149 Fed. 346, 348, 79 C. C. A. 284), it seems to me unnecessary in the case at bar to commit myself to any general theory in respect of its scope. In this regard it is wiser to follow the admonition of Re Order of Sparta, supra, and decide as little as possible.

In the case at bar the Tidewater Coal Exchange, if it was not a commercial, was certainly a business, association. The objectors assume that there cannot be such an association unless it is organized for the direct profit of the members themselves, but surely this is a

harsh and unwarranted limitation to impose upon the word. The purposes of this association were to speed the carriage of coal, to avoid impounding so many cars, and to prevent delays at the wharves. It is true that no dividends would be declared, but these results were none the less commercial advantages which benefited the members individually, as well as the community at large. If anything turns on the choice of the word "company," and even if the limitations imposed upon the succeeding word "corporation" apply to "unincorporated company," this association in any view falls within that phrase.

Nor can I see any distinction due to the fact that the association was formed under pressure of war. That mere fact did not change the legal results of men's conduct, and motives are in any case irrelevant. These persons, whether individuals, firms, or corporations, formed a common purpose, made it articulate in words, and appointed agents to secure its execution. They were in every sense a corporation except for the benediction of a state, which they eventually got, but which did not change their purpose or the relations they meant to establish. It was that common purpose so defined, and so delegated for fulfillment, which created an association, and continued it until the purpose was itself completed. So far as I can see, it is immaterial what determined their decision.

The objection to the jurisdiction of this court seems to me, therefore, ill taken, and is overruled. I understand that this was the only point submitted at the hearing, and therefore I will not direct an adjudication until the parties have been heard again.

[2] The status of the objectors is indefinite, and if the point were pressed I should suppose that they could not be heard. Certainly that is the case if they are debtors of the Exchange. However, I shall assume, as no such point was raised, that they have the status of creditors, and I dispose of the case on that theory.