## In re MANUFACTURING LUMBERMEN'S UNDERWRITERS.
### No. 14270.

District Court, W. D. Missouri, W. D.
Dec. 30, 1936.

Scott Timmons, of Carrollton, Mo., and William Allen and Charles M. Howell, Jr., both of Kansas City, Mo., for petitioner C. L. Gray Lumber Co. and other subscribers at Manufacturing Lumbermen's Underwriters.

A. J. Granoff, of Kansas City, Mo., for receiver.

Charles M. Blackmar (of Meservey, Michaels, Blackmar, Newkirk & Eager), of Kansas City, Mo., for petitioning creditors.

Harry L. Jacobs (of Ringolsky, Boatright & Jacobs) and Terence O'Brien, both of Kansas City, Mo., for Superintendent of Insurance of State of Missouri.

OTIS, District Judge.

On December 1, 1936, at 4:50 p. m., there was filed with the clerk of this court a voluntary petition in bankruptcy on behalf of Manufacturing Lumbermen's Underwriters (described, in the style of the petition, as "Manufacturing Lumbermen's Underwriters, a Reciprocal Exchange"). Immediately thereafter there was prepared by the clerk (or more accurately, by one of his deputies) and filed an order reciting that:

"At Kansas City, in said District, on the 1st day of December, A. D. 1936, before the Honorable Merrill E. Otis, Judge of said Court in Bankruptcy, the petition of Manufacturing Lumbermen's Underwriters, a Reciprocal Exchange of Kansas City, Jackson County, Missouri, that it be adjudged a bankrupt, within the true intent and meaning of the Acts of Congress relating to bankruptcy, having been heard and duly considered, the said Manufacturing Lumbermen's Underwriters, a Reciprocal Exchange is hereby declared and adjudged a bankrupt accordingly.

"It is Therefore Ordered, That upon the petition filed in this court by or against said bankrupt on the 1st day of December, A. D. 1936, said matter be referred to Fred S. Hudson, one of the Referees in Bankruptcy of this court, to take such further proceedings therein as are required by said Acts; and that the said Manufacturing Lumbermen's Underwriters, a Reciprocal Exchange, shall attend before said Referee on the —————— day of —————— at Kansas City and thenceforth shall submit to such orders as may be made by said Referee or by this Court relating to said bankruptcy.

"Witness the Honorable Merrill E. Otis, Judge of the said court, and the seal thereof, at Kansas City in said District, on the 1st day of December, A. D. 1936.

"A. L. Arnold, Clerk;
"By M. C. Hawkins, Deputy Clerk."

Notwithstanding the recitals of this order, judicial notice is taken of the fact (and it is found to be a fact) that the voluntary petition referred to in the first paragraph hereof and in the order set out above never was submitted to the judge of the court, it never was heard or considered by the judge, nor was any order made by the judge declaring and adjudging the petitioner a bankrupt. The so-called order of adjudication and reference, as has been stated, was made by a deputy clerk.[1] Shortly afterward the referee in bankruptcy made an order appointing a receiver for the bankrupt, that order having been made, as it appears, ex parte and without notice to any.

The superintendent of insurance for the state of Missouri had taken over the affairs of the Manufacturing Lumbermen's Underwriters at a date earlier than the filing of the petition in bankruptcy. Subsequent to the filing of the petition in bankruptcy and appointment of a receiver by the referee in bankruptcy, counsel for the superintendent of insurance, having discovered the orders that had been made in this court and by the referee, filed a motion to set aside the order of adjudication and reference. Thereafter various subscribers of Manufacturing Lumbermen's Underwriters filed a motion of a similar character. These motions have been argued and submitted and are now to be ruled.

1. That one of the questions raised by the motions which has been most elaborately argued is whether the Manufacturing Lumbermen's Underwriters is such an entity as may be adjudicated a bankrupt. The motions raise, however, certain questions touching the authority for the filing of the petition, which should be considered and disposed of before consideration is given to the question just stated.

The petition purports to be filed on behalf of "Manufacturing Lumbermen's Underwriters, a Reciprocal Exchange" (described also in the petition as sometimes being known as "Subscribers at Manufacturing Lumbermen's Underwriters"), by Rankin-Benedict Underwriting Company, "Its duly authorized attorney in fact." It is alleged in the motions, first, that the authority of Rankin-Benedict Underwriting Company as attorney in fact for Manufacturing Lumbermen's Underwriters did not include authority to file a voluntary petition in bankruptcy, and, second, that before the petition in bankruptcy was filed, Rankin-Benedict Underwriting Company had been removed as attorney in fact by Manufacturing Lumbermen's Underwriters. These are the two matters which first must be disposed of before consideration is given to the greater question as to whether such an entity as we have here may ever be adjudicated a bankrupt under the bankruptcy statute.

Manufacturing Lumbermen's Underwriters is one of those comparatively mod-

---

[1] We have here called attention to the actual facts of the situation presented. It has been represented to us that what was done was in accordance with the usual practice in this district and it appears that that is true. On that account the ruling on the motions under submission will not be based on the ground that no adjudication ever has been made and that therefore there is no adjudication to be set aside. However, it ought to be clearly stated here that the positive requirement of the Bankruptcy Act (title 11 U.S.C. A. § 41 (g) that "Upon the filing of a voluntary petition the judge shall hear the petition and make the adjudication or dismiss the petition," is not satisfied and cannot be satisfied by any act of the clerk alone, even if in accordance with practice, or even if pursuant to a rule of court. The judge cannot abandon his function. The clerk cannot usurp the function of the judge. Even in the absence of the judge from the division (in this case the judge was not absent from the division) the clerk can only refer, he cannot enter an order of adjudication.

ern developments commonly spoken of as "reciprocal insurance exchanges." Originally they were relatively simple in nature and theory. A group of men insured each other in a plan in which the liability of each was limited and in which each was represented by an attorney in fact who transacted the business details made necessary by the plan and received in compensation a certain part of the assessments levied against the subscribers to the plan. This germ idea grew and developed. Other types of insurance came to be written than the original inter-insurance. Finally (and this is true of Manufacturing Lumbermen's Underwriters) the activities carried on by the attorney in fact came very closely to resemble those of stock insurance companies and of mutual insurance companies. While, however, this evolution may have resulted in an entity of a different character than that which existed at the beginning, the powers of the attorney in fact essentially are of the same character as they always have been. They are set out in a written power of attorney executed, not by the Manufacturing Lumbermen's Underwriters as a separate entity, but by each subscriber. The attorney in fact has no powers except such as are conferred upon hm by the power of attorney. The full text of the power of attorney is set out in the margin.[2]

---

[2] Application for Insurance
Manufacturing Lumbermen's Underwriters

1. We hereby make application to become a subscriber of Manufacturing Lumbermen's Underwriters, desiring to exchange indemnity with other subscribers with separate and limited liability.

2. Now, therefore, the undersigned as a subscriber of Manufacturing Lumbermen's Underwriters hereby appoint Rankin-Benedict Underwriting Company of Kansas City, Missouri, Attorney-in-fact for us and in our name, place and stead, to exchange indemnity with such other subscribers; to accept and make binding upon us applications from such subscribers for the exchange of such indemnity; to make, issue, subscribe, deliver, amend, modify, change, reinsure and cancel contracts therefor, containing such terms, clauses, warranties, conditions and agreements as our said Attorney shall deem proper; to perform or waive any agreements or stipulations of any such contracts; to give, receive and waive any notices or proofs of loss; to adjust, settle and pay all losses and claims under any such contract or other evidence of indemnity; to demand, collect, receive and receipt for all moneys due to or from us in connection with the exchange of indemnity herein authorized and to disburse same within the authority herein conferred; to appear for us in any suit, action or legal proceedings, and to institute, prosecute, defend, compromise or settle any suit, action or other legal proceeding or any claim that may arise out of any such contract; to do any and all things which in the judgment of said Attorney may be necessary and proper for the protection of our interests in regard to any such contracts; and to do or perform any other or different acts that we ourselves could do in relation to any contract herein authorized.

3. Said Attorney is hereby specifically authorized for us and in our name to execute any and all documents and to do and perform all other acts which are now or may hereafter become necessary or advisable to effect compliance under the laws of any state concerning the exchange of indemnity contracts herein provided for, hereby confirming and adopting as binding upon us all appointments for service of process heretofore made.

4. The intent and purpose of this instrument is to clothe said Attorney with the power necessary to enable us through it to exchange indemnity with other subscribers; provided, however, that said Attorney shall have no power to make us jointly liable with any other subscriber, and every liability of whatever nature it is authorized to incur for us hereunder shall be in every case several and not joint.

5. There shall be no joint funds, but a separate, individual account shall be kept by our Attorney for us and for each subscriber, and all accounts shall be open at any time for inspection by either ourselves or the Advisory Committee.

6. Said Attorney shall not bind us on any one risk for an amount in excess of our annual premium deposits.

7. As compensation for the services to be performed hereunder, said Attorney shall be entitled to twenty per cent of all premium deposits made by us, and shall defray all expenses incident to the exchange of indemnity hereby authorized, except taxes, license fees, legal, re-insurance and brokerage expenses, expenses of adjustments (when made by independent adjusters), and expenses incurred by the Advisory Committee, of which our account shall bear its pro rata share.

8. An Advisory Committee composed of not less than seven subscribers shall be elected annually for a term expiring on the first Tuesday in December of each year, and in annually choosing successors our Attorney shall select a list to be voted upon, which list shall be approved by

A study of the power of attorney discloses at once that Manufacturing Lumbermen's Underwriters is not the principal who has appointed an attorney in fact. Each subscriber of Manufacturing Lumbermen's Underwriters has appointed Ran-

the then Advisory Committee and submitted to all subscribers for their vote on or before November 1st of each year. If the nominees so selected do not meet the approval of the subscribers, they may nominate a committee upon the signatures of ten per cent of all the subscribers and submit such list to the Attorney, who shall submit both lists to all subscribers for vote, and the seven nominees (or the number then constituting the committee) receiving the largest number of votes shall be declared elected. If any member of said committee shall cease to exchange indemnity with other subscribers, or if his power of attorney shall be revoked or cancelled, he shall cease to be a member of the committee. Said committee shall serve until their successors are chosen, any vacancies occurring in said committee to be filled by the remaining members until the following election.

9. In the government of said exchange of indemnity and in defining the duties of said Attorney, the Advisory Committee may adopt such rules and regulations as they may deem best, providing such rules and regulations do not conflict with any of the terms of this instrument.

10. Our said Attorney, with the approval of the Advisory Committee, shall have the power to assess us to an amount not exceeding the sum of our annual premium deposits to protect outstanding obligations created pursuant to this instrument, and we hereby agree to pay such assessment.

11. The Advisory Committee shall select a trustee, said trustee to be a trust company with a capital stock of at least one million dollars and a resident of Kansas City, Missouri. All moneys belonging to us that may come into the hands of our Attorney shall be turned over to said Trustee, who shall thereupon pay to said Attorney the sums provided for under the terms of paragraph 7 hereof. The remaining portion of said funds shall be held by said trustee for us as our individual funds and shall be deposited by said trustee in such depositories or invested in such securities as may be approved by said Advisory Committee. All such funds so deposited by the trustee shall be deposited to the joint account of our Attorney and said trustee, and all withdrawals from such fund shall be by check signed by said Attorney and countersigned by said Trustee.

12. Our said Attorney shall give bond to said trustee for the safety of funds while in the possession of said Attorney in such sum as said Committee shall require.

13. In the event said Attorney shall fail or refuse to discharge its duties hereunder in a manner satisfactory to the Advisory Committee, said Committee upon a three-fourth vote may designate temporarily a substitute Attorney to act in its place and stead, and in said event said substitute Attorney shall be clothed with all the powers and duties hereby conferred on said Attorney.

14. The Advisory Committee shall set aside out of our savings a net surplus equal to twice the amount of our annual deposits and all other savings shall be returned to us annually in cash. It is provided, however, that said Committee may at their option authorize the return of a percentage of our savings before the full amount of such surplus fund has been accumulated. If policies hereunder are issued through brokers or at a deviated premium deposit, the foregoing provisions of this paragraph and the provisions of paragraphs five and ten do not apply to these policies.

15. In the event any contract of indemnity herein provided for shall be cancelled by our said Attorney an appeal may be had to the Advisory Committee, and if said Committee shall decide that said contract should not have been cancelled the same shall be reinstated.

16. In the event any sum to be paid by us for current indemnity hereunder shall not be paid within thirty days after issuance of contract of indemnity to us, same shall bear interest at the rate of six per cent until paid, and in the event same shall not be fully paid within four months after the date of issuance of such contract, then failure to make such payment shall operate as a cancellation of such contract.

17. All books, files, surveys and other documents and instruments accumulated through the exchange of the indemnity herein provided for shall be considered as incident thereto and shall pass to the use and benefit of any and all succeeding Attorneys, without charge or cost to said succeeding Attorneys.

18. Said Attorney agrees that as a part of its duties to be performed it shall cause inspections to be made each year of all the lumber manufacturing properties covered by contracts of indemnity issued hereunder; provided, however, that an inspection of any such property may be omitted where unusual or extraordinary conditions beyond the control of said Attorney shall exist.

19. This instrument may be revoked or cancelled at any time by either party giv-

kin-Benedict Underwriting Company as his attorney in fact. No power of attorney has been jointly executed by all of the subscribers. The power of attorney which each subscriber has executed does not purport to (and could not, of course) confer upon the attorney in fact authority to do anything on behalf of any other subscriber or on behalf of all subscribers. Obviously no subscriber could empower an attorney in fact to do for him what he could not do for himself and no subscriber, under this power of attorney, undertakes to do anything of that character. Herein is disclosed the most convincing reason for the conclusion that the attorney in fact had not the power to do what it attempted by the filing of this petition in bankruptcy. Empowered by individuals to act for each of them in their relations with other individuals (also subscribers), the attorney in fact was not empowered and could not have been empowered to act for an entity distinct and separate from the subscribers. If A authorizes X to contract, in his name and on his behalf as an attorney in fact, with B and C, if B separately authorizes X to so contract with A and C, if C similarly authorizes X to contract with A and B, certainly the power of X is limited to representation by him separately of A and B and C and not of A, B, and C as a group or entity, distinct from the individuals composing it.

When at the oral argument of these motions learned counsel for Rankin-Benedict Underwriting Company, claiming to be the attorney in fact for Manufacturing Lumbermen's Underwriters, was asked to point to the precise language in the power of attorney which empowered the attorney in fact to file a petition in bankruptcy, he replied by saying that the authority was found in that part of paragraph 2 of the power of attorney, which reads as follows:

"2. * * * the undersigned as a subscriber * * * hereby appoints Rankin-Benedict Underwriting Company * * * attorney in fact for us and in our name, place and stead, to exchange indemnity with * * * other subscribers; to accept and make binding upon us applica-tions from such subscribers for the exchange of such indemnity; to make, issue, subscribe, deliver, amend, modify, change, reinsure and cancel contracts therefor * * *; * * * to adjust, settle and pay all losses and claims under any such contract; * * * to appear for us in any suit, action or legal proceedings, and to institute, prosecute, defend, compromise or settle any suit, action or other legal proceeding or any claim that may arise out of any such contract; to do any and all things which in the judgment of said attorney may be necessary and proper for the protection of our interests in regard to any such contracts; and to do or perform any other or different acts that we ourselves could do in relation to any contract herein authorized."

Expressing his thought more fully than by a mere reference to the language quoted from the power of attorney, learned counsel argued that, since the attorney in fact was empowered to "defend any suit, action or other legal proceeding or any claim that may arise out of any such contract (and) to do any and all things which in the judgment of said attorney in fact may be necessary and proper for the protection of our interests in regard to any such contracts," and since, sometimes, the best defense an individual has against actions threatened against him on his contracts (at least it is one defense) is to seek an adjudication in bankruptcy, therefore the attorney in fact is empowered on behalf of his principal to resort to bankruptcy. The argument does not seem convincing to us and that for the reason already suggested herein.

By the very words relied on, the power vested in the attorney in fact is power only to defend suits, actions, and legal proceedings and claims arising out of contracts such as the attorney in fact may have entered into for the subscribers, its principals. The attorney in fact, however, is expressly forbidden to enter into any contract whereby any subscriber becomes jointly liable with any other subscriber. It is expressly provided in the power of attorney that "every liability of whatever nature he (the attorney in fact) is author-

ing to the other party five days' notice in writing, and thereupon our Attorney shall cancel all unexpired indemnity exchanged by us through it and within thirty days return to us any funds belonging to us, including any net surplus to our credit.

20. The personal pronoun used to re-fer to the subscriber or Attorney shall apply regardless of number or gender.

In witness whereof we have hereunto set our hand and seal this —— day of —— 19—, at ——.

Witness: ——————.

5,000—552,534 By ————.

ized to incur for us hereunder (that is, for the subscriber) shall be in every case several and not joint." It is expressly provided in the power of attorney that "there shall be no joint funds but a separate, individual account shall be kept by our attorney for us and for each subscriber." If it could not well be argued (no such argument has been made) that because A authorizes X to enter into a contract for him with B and to "defend * * * any suit, action or other legal proceeding * * * that may arise out of any such contract" that, therefore, in the event of such a suit being instituted, X is authorized to file a voluntary petition in bankruptcy upon behalf of A, how can it be argued that X derives any authority to file a petition in bankruptcy from a dozen or a hundred or a thousand such separate powers of attorney, not indeed upon behalf of any one of its principals or all of its principals separately, but on behalf of a vague and shadowy entity which is not its principal at all and which has authorized it to do nothing.

Let us suppose that the language of the power of attorney actually included a reference to bankruptcy. Let us suppose the power of attorney read thus: "The undersigned as a subscriber of Manufacturing Lumbermen's Underwriters hereby appoint Rankin-Benedict Underwriting Company * * * attorney in fact for us and in our name, place and stead, to exchange indemnity with such other subscribers; to accept and make binding upon us applications from such subscribers for exchange of such indemnity; to make, issue, subscribe, deliver, amend, modify, change, reinsure and cancel contracts therefor * * *; to appear for us in any suit, action or legal proceedings, and to institute, prosecute, defend, compromise or settle any suit, action or other legal proceeding or any claim that may arise out of any such contract, AND, IN THAT CONNECTION, TO FILE A PETITION IN VOLUNTARY BANKRUPTCY FOR US. * * *"

Would it be argued by any one that such authorization thus expressly referring to the subject of bankruptcy possibly could constitute an authorization of the attorney in fact to file a petition in bankruptcy on behalf of any other than the particular subscriber so authorizing the attorney in fact to act for him? Of course, the answer to the question is, "No." Certainly, if such a power of attorney would constitute no authorization for filing a petition in bankruptcy for some other than the subscriber, a hundred or a thousand such powers of attorney would accomplish no different result. A thousand times nothing is still nothing.

Let us suppose now still different language in the power of attorney and have it read thus:

"The undersigned as a subscriber of Manufacturing Lumbermen's Underwriters hereby appoint Rankin-Benedict Underwriting Company * * * attorney in fact for us and in our name, place and stead, to exchange indemnity with such other subscribers; to accept and make binding upon us applications from such subscribers for the exchange of such indemnity; to make, issue, subscribe, deliver, amend, modify, change, reinsure and cancel contracts therefor; * * * to appear for us in any suit, action or legal proceedings and to institute, prosecute, defend, compromise or settle any suit, action or other legal proceeding or any claim that may arise out of any such contract, and in that connection, TO FILE PETITIONS IN BANKRUPTCY FOR US AND ALL OTHER SUBSCRIBERS TO LIKE POWERS OF ATTORNEY (OR FOR THAT ENTITY, DISTINGUISHABLE FROM THE SUBSCRIBERS, ARISING FROM THE FACT THAT MANY, AS SUBSCRIBERS, HAVE EXECUTED SIMILAR POWERS OF ATTORNEY)."

Now we have expressed what learned counsel say really was intended. Such an instrument, however, would be meaningless and worthless in that part of it which we have here set out in capitals. A stream cannot rise higher than its source. An attorney in fact cannot be given a power greater than that which his principal may exert on his own behalf. No man can authorize another to file a petition in bankruptcy for a third person. The very phrase "voluntary petition" supposes an exercise of the will of the petitioner. If this supposed entity, Manufacturing Lumbermen's Underwriters, is something other than any of its individual subscribers, is something other than all of its individual subscribers, then, of course, neither one individual subscriber nor all, acting separately, can express its will, no more than one individual can express the will of another.

2. Assuming now arguendo that Rankin-Benedict Underwriting Company, if it were still the attorney in fact for each of the subscribers of Manufacturing Lumbermen's Underwriters, was authorized under the powers of attorney to file a voluntary petition in bankruptcy on behalf of Manufacturing Lumbermen's Underwriters, we are brought to the question whether it was, at the time of the filing of this petition, still attorney in fact for the subscribers.

Each of the powers of attorney provides for an advisory committee. The advisory committee, among other powers, has the power "In the event said attorney (the attorney in fact) shall fail or refuse to discharge its duties hereunder in a manner satisfactory to the Advisory Committee, said Committee upon a three-fourths vote may designate temporarily a substitute attorney to act in its place and stead, and in said event said substitute attorney shall be clothed with all the powers and duties hereby conferred on said attorney."

An advisory committee had been created (so did the evidence received at the hearing on the motions show and it is found as a fact that there was such an advisory committee). On November 30, 1936, the advisory committee held a meeting and by a three-fourths vote adopted a resolution as follows (a finding of fact to that effect is made):

"November 30th, 1936.

"Whereas, Rankin-Benedict Underwriting Company, Attorney-in-fact at Manufacturing Lumbermen's Underwriters, and its officers, directors and employees in charge of its affairs, have failed and refused to discharge the duties of said company as Attorney-in-fact in accordance with the powers of attorney in effect at Manufacturing Lumbermen's Underwriters in a manner satisfactory to the Advisory Committee:

"Therefore, be it resolved, that said Advisory Committee by a three-fourths vote thereof, hereby designates temporarily as substitute attorney Vincent B. Coates to act in the place and stead of Rankin-Benedict Underwriting Company as Attorney-in-fact at said Manufacturing Lumbermen's Underwriters, said substitute attorney to be clothed with all the powers and duties conferred upon the said Rankin-Benedict Underwriting Company, Attorney-in-fact, by the powers of attorney in effect at said Manufacturing Lumbermen' Underwriters, said substitution to become effective at once."

If this action of the advisory committee had the effect of removing on November 30, 1936, Rankin-Benedict Underwriting Company as the attorney in fact for the subscribers of Manufacturing Lumbermen's Underwriters, then, of course, Rankin-Benedict Company did not, on December 1, 1936, have any authority to file for Manufacturing Lumbermen's Underwriters the voluntary petition in bankruptcy. Learned counsel contesting the motions, however, while conceding the power of the advisory committee to substitute an attorney in fact for Rankin-Benedict Underwriting Company, assert that that power had not been fully exercised, and that consequently Rankin-Benedict Company had not yet been removed as attorney in fact at the time the petition in bankruptcy was filed. They contend that before the relation of Rankin-Benedict Company as attorney in fact was terminated, notwithstanding such a resolution as that adopted by the advisory committee, the attorney in fact must have been notified of that action. And they assert that no notice had been received by the attorney in fact before the filing of the petition in bankruptcy. They contend also that whoever was designated as a substitute attorney in fact must have accepted and qualified before the substitution is complete, and they contend that no showing has been made that the substitute attorney did accept and did qualify.

There was evidence offered at the hearing which would support the conclusion (and it is found as a fact) that two vice presidents of Rankin-Benedict Underwriting Company had been notified of the action of the advisory committee prior to the time when the board of directors of that company authorized the filing of the petition in bankruptcy and before the petition in bankruptcy was filed. These vice presidents did not, however, communicate the knowledge they had received to the board of directors in session nor to others of the board of directors.

While one of the two vice presidents referred to was the newly designated attorney in fact whose interest, therefore, was antagonistic to that of Rankin-Benedict Underwriting Company (and perhaps on that account the company should not be charged with his knowledge), nei-

ther that nor any similar reason has been suggested for concluding that the knowledge of the other vice president referred to should not be charged to the company. Rankin-Benedict Underwriting Company did then before the filing of the petition in bankruptcy have knowledge of the substitution of an attorney in fact for it (a finding of fact to that effect is here made). If, however, this conclusion is disregarded, it is still to be considered whether in this case the giving of notice by the advisory committee to the attorney in fact of its substitution of another attorney in fact is a prerequisite to the termination of the authority of the attorney in fact.

Certainly it will not be necessary to resort to the general law of agency for a determinaton of the question stated if it may be determined from the very instrument creating the attorney in fact and providing for the manner of the suspension of the powers of the attorney in fact. The exact language of the power of attorney (paragraph 13 thereof) is this: "In the event said attorney shall fail or refuse to discharge its duties hereunder in a manner satisfactory to the Advisory Committee, said Committee upon a three-fourths vote may designate temporarily a substitute attorney to act in its place and stead, and in said event, said substitute attorney shall be clothed with all the powers and duties hereby conferred on said attorney."

█ This and all of the provisions of the power of attorney were drawn by the attorney in fact. They were not drawn by the subscribers. If there are ambiguities in the power of attorney, they are to be resolved against the draftsman. If, because nothing is said in the power of attorney to the effect that the attorney in fact shall have notice of charges against it, shall have a hearing upon the charges preferred, and shall have notice of action taken by the advisory committee, a doubt may be said to arise as to whether those steps or any of them were intended by the parties as prerequisite to the actual substitution of a new attorney in fact, that doubt must be resolved against Rankin-Benedict Company. In our view of the power of attorney, however, there is no such doubt.

The provision governing the exercise of the power lodged in the advisory committee is full and complete. The limitations upon the power of the committee which were intended are expressed. The expression of those limitations (as that a three-fourths vote is required to substitute an attorney in fact for the attorney in fact named in the power of attorney) exclude the idea that other limitations upon the power are implied. The plain meaning of the provision (in the very language of the provision) is that "in said event" (i. e., when the committee upon a three-fourths vote has designated a substitute attorney) the substitute attorney "shall be clothed (that is, is clothed) with all the powers and duties hereby conferred on said attorney."

If the attorney in fact which drew this power of attorney intended there should be other prerequisites to its removal than those stated, undoubtedly those other prerequisites would have been incorporated by it in the power of attorney. It was satisfied with the provision as it caused it to be written, as well it might be satisfied, in view of the fact that the advisory committee in reality was selected by the attorney in fact, in reality was its mere alter ego. (One who reads the provisions governing the selection of the advisory committee cannot but be reminded of recent Hitlerized elections in the German Reich.)

It will be borne in mind, of course, in connection with the discussion in this subdivision of the opinion, that we are not here concerned with what rights a third party might have obtained against subscribers of Manufacturing Lumbermen's Underwriters by reason of action taken by the attorney in fact before the third party was notified of the severance of the relationship between the attorney in fact and the subscribers, nor are we concerned with what rights the attorney in fact might have had against the subscribers for services rendered after the advisory committee had designated a substitute attorney and before the attorney in fact was notified of that action. The question here is simply this: If A employs B as his attorney in fact to file on his behalf a petition in bankruptcy on the understanding, however, that his authority to file it shall be terminated at the will of A, without notice to B, is notice to B required for the termination of the authority? The question answers itself.[3]

---

[3] We have not discussed in this opinion a question raised by counsel and earnestly argued, the question as to the right of movants to contest the authority of the Rankin-Benedict Underwriting Company to file the petition. Certainly, of its own

3. Setting aside now the conclusions thus far stated (agreeing arguendo as to these matters with counsel for the Rankin-Benedict Underwriting Company), we come to the ultimate question: Is Manufacturing Lumbermen's Underwriters such an entity as is subject to the jurisdiction of a court of bankruptcy on a voluntary petition?

 Certainly it is not entitled to the benefits of the Bankruptcy Act "as a voluntary bankrupt" unless it is a "person" within the meaning of that word as it is used in section 22 (a), title 11 U.S.C. (11 U.S.C. A. § 22(a).[4] Does that word then include such an association as Manufacturing Lumbermen's Underwriters? Obviously the question can be answered only after the word has been defined.

 Assuming for the present that the word "person," as used in section 22 (a) is not defined in section 1 (11 U.S.C.A. § 1), entitled "Meaning of Words and Phrases," the word must be taken in its usual and generally accepted meaning, with such modifications only as the context requires. The usual and generally accepted meaning of the word "person," as used in common speech, is: "A being possessing or forming the subject of personality."[5] The usual and generally accepted meaning of the word "person," as used in law, includes natural persons and artificial, conventional, or juristic persons. The immediate context in section 22 (a) makes it clear that the word includes such artificial persons as corporations (for the language is, "any person, except a municipal, railroad, insurance, or banking corporation"). The implication of that immediate context, however, certainly does not draw in artificial persons, if there are any, other than corporations. Considering the context of paragraphs (a) and (b) together, it is clear that the word "person" in (a) includes both "natural" and artificial persons (for paragraph (b) begins: "Any natural person," indicating a subdivision of the class described by the phrase "Any person," with which paragraph (a) begins, and implying as the only other subdivision, artificial persons). We do not consider that any more inclusive meaning can be drawn from the context.

But not every association of natural persons is an artificial, conventional, or juristic person. (If A and B and C interchange among themselves contracts of mutual insurance, an association, in the broad sense of the word, may be said to have resulted, but certainly a new person—an artificial, conventional, or juristic person, has not thereby been created. If instead of three, three thousand interchange insurance contracts, still no artificial person has been created.) It is only if an association is of such a nature as that there results from it a new and distinct entity, recognized as such by law, that it may be said to be an artificial, a conventional, a juristic person. As the eminent jurist, Learned Hand, said, when he was a district judge (he was discussing this very section): "To the creation of a person vested with rights and bound by obligations, there is always necessary * * * some fiat of the state." In re Tidewater Coal Exchange (D.C.) 274 F. 1008, 1010.

Certainly, moreover, only that individual or that entity can be a "person" within the meaning of section 22 (a) who (or which) is capable of incurring debts. A natural person sui juris is such an one. And so is a corporation. So is any artificial, conventional, or juristic person.

---

motion, the court may inquire whether one who purports to seek for another the court's consideration and judgment has any authority to act for that other. Certainly, of its own motion, when the court has discovered that its judgment has been obtained by one who had no authority whatever to seek it, the court will set that judgment aside.

[4] § 22. (a) Any person, except a municipal, railroad, insurance, or banking corporation, shall be entitled to the benefits of this title as a voluntary bankrupt.

(b) Any natural person, except a wage earner or a person engaged chiefly in farming or the tillage of the soil, any unincorporated company, and any moneyed, business, or commercial corporation, except a municipal, railroad, insurance, or banking corporation, owing debts to the amount of $1,000 or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this title.

[5] The definition quoted is No. 2 in the nine definitions given in Webster's New International Dictionary. No. 8 also should be set out. It is: "Law. A human being (natural person), or a body of persons, or, in a wider sense, an aggregate of property (artificial, conventional, or juristic person), that is recognized by law as the subject of rights and duties." Other definitions in Webster obviously are not useful here.

Considering the word "person" as used here in its usual and generally accepted sense and in the light of the context in which it is used, our conclusion is that it includes only natural persons and corporations. In reaching that conclusion we have assumed that the statutory definition of "persons" in subdivision 19 of section 1 (11 U.S.C.A. § 1(19) had no application to the word "person" as used in section 22. We would think that assumption was well grounded were it not for the decision of the Supreme Court in Meek v. Centre County Banking Co., 268 U.S. 426, 45 S.Ct. 560, 69 L.Ed. 1028.

Section 1 of the act (11 U.S.C.A. § 1) is entitled "Meaning of Words and Phrases." It provides that "The words * * * used in this title * * * shall, unless the same be inconsistent with the context, be construed as follows: * * * (19) 'persons' shall include corporations, * * * and officers, partnerships, and women."

In the Meek Case the Supreme Court distinctly ruled that this statutory definition applied to the word "person" used in section 22(a) and that therefore a partnership was a "person" within the meaning of that section. That interpretation of section 22(a) was not dictum, it was a part of the decision of the case.

By reason of the opinion in the Meek Case we are constrained to rule that section 22 (a) should be interpreted as if it read: Section 22 (a). Any person (the word person shall be construed to include a corporation, an officer, a partnership, a woman), except a municipal, railroad, insurance, or banking corporation, shall be entitled to the benefits of this title as a voluntary bankrupt.

But a partnership is not an artificial person. Congress recognized that fact; Congress recognized that a partnership would not fall within the meaning of the word "person" except by a statutory enlargement of its accepted meaning. The meaning of the word, therefore, was enlarged so as to include a partnership. That very enlargement emphasizes the conclusion just stated, that the word, except as enlarged, includes only artificial persons, recognized as such by law, created such by fiat of the state.

While certain of the text writers say that an unincorporated association may become a voluntary bankrupt, only one case in the published reports so holds. In that case (In re Sargent Lumber Co., 287 F. 154) Judge Trieber in the District Court ruled that what he described as an "unincorporated company" was within the express provisions of section 22 (b), and that therefore it could be adjudged a voluntary bankrupt. But 22 (a), governing who may become voluntary bankrupts, unlike 22 (b) governing who may be adjudged involuntary bankrupts, does not include unincorporated companies. That omission seemingly was overlooked by the learned judge.[6] Judge Trieber's ill-considered interpretation of section 22 (a), never judicially announced either before nor after the Sargent Case, stands alone. Apparently it has served no other purpose than to mislead the writers of textbooks.

If our conclusion is correct, that the word "person" in section 22 (a) includes only natural persons and artificial persons

---

[6] After the argument of these motions the court specially invited those of counsel who were interested in upholding this adjudication to cite cases holding that any unincorporated association or company could be adjudicated a voluntary bankrupt. In response to the invitation the following cases, in addition to In re Sargent Lumber Co., were cited: Meek v. Centre County Banking Co., 268 U.S. 426, 45 S.Ct. 560, 69 L.Ed. 1028; In re Sugar Valley Gin Co. (D.C.) 292 F. 508; United Mine Workers v. Coronado Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; In re McCloskey et al. (D. C.) 18 F.(2d) 311; Swiss Insurance Co. v. Miller, 267 U.S. 42, 45 S.Ct. 213, 69 L.Ed. 504. We have examined those cases. The Meek Case, as we have seen, held that a partnership was a person, because of the statutory definition. There is exactly the same holding, and no more, in the case of In re Sugar Valley Gin Co. (D.C.) The United Mine Workers Case does not discuss the interpretation of section 22 of the Bankruptcy Act. It does hold that, while generally an unincorporated association is not a legal person, a national labor union, considering its special characteristics and legislation recognizing it, is such a person as may be sued for torts. The McCloskey Case has to do with a partnership and adds nothing to the Meek Case. Swiss Insurance Co. v. Miller holds only that the word "person" includes an association or other unincorporated body under a statute expressly so providing. It seems to us that none of these cases has any significance in the present connection.

in the common-law sense, that is, corporations[7] (in addition to partnerships which are strongarmed into the class of persons by legislative definition), then Manufacturing Lumbermen's Underwriters is not such an entity as can become a voluntary bankrupt. No other description of its nature is necessary to support that conclusion than to say that it is not a corporation

If, however, Judge Trieber was right and we have erred in the interpretation we have given to the word "person," if it was intended to include in that word at least some unincorporated associations, certainly it could not have been intended to include an association which could not become indebted. The sole constitution of this association is the power of attorney given by each subscriber to the attorney in fact. We have read it again and again. We have not discovered anything which expressly or by implication modifies the positive provisions in it against joint debts and obligations. Consider again paragraphs 4 and 5 of the power of attorney: "4. * * * said attorney shall have no power to make us jointly liable with any other subscriber, and every liability of whatever nature it is authorized to incur for us hereunder shall be in every case several and not joint." "5. There shall be no joint funds, but a separate individual account shall be kept by our attorney for us and for each subscriber. * * *" We have found nothing in the constitution of the association pursuant to which the association as an entity, separate from its subscribers and from the attorney in fact for each subscriber, can become indebted. We have seen no statute under which the association, as a distinct entity, can become indebted.[8] How can such an entity so limited become a bankrupt? Is not the very cornerstone of bankruptcy the indebtedness of the bankrupt?

4. Finally, if this association is a "person" within the meaning of that word as used in section 22 (a), is it an "insurance corporation" within the meaning of that phrase as used in that section and as such excluded from the class of those who can become voluntary bankrupts? We would answer that question in the negative, but we consider it is unnecessary greatly to amplify that answer. The word "corporation" must be construed to include "unincorporated companies and associations." Section 1 (6), as amended May 27, 1926 (11 U.S.C.A. § 1 (6). All of counsel seem to agree that Manufacturing Lumbermen's Underwriters is an "unincorporated company or association." But, while we think each subscriber is engaged in the business of insurance and while we think the attorney in fact certainly is engaged in the insurance business, we do not think the association, as an entity, is so engaged. Moreover, if it should be said (and it might well be said) that the attorney in fact is the "pulsating heart" of this reciprocal exchange, it is the reality and the rest is but a mask put on, then also it must be said that the attorney in fact has filed no petition here for and on its own behalf.

The motions to set aside the adjudication in bankruptcy are sustained. It is so ordered.

Exceptions are allowed to all opposing the motions.

[7] Conceivably the argument might be made that because, by construction, corporations have thus been brought within the meaning of the word "person" as used in section 22 (a) and because, by the amendment of May 27, 1926 (section 1(6), the word "corporations" (when used in the act) "shall * * * include * * * unincorporated companies and associations," (11 U.S.C.A. § 1(6), therefore the word "person" must be construed to include unincorporated companies and associations. The argument is unsound. A statutory definition is to be applied directly to the word in the act which is defined; it is not to be applied to a word used, not in the act, but in a judicial interpretation of the act, and thus carried through to the word or phrase in the act which has been interpreted.

[8] We have been curious to see the schedules in this proceeding that we might get therefrom some hint as to the theory upon which Manufacturing Lumbermen's Underwriters, as an entity distinct from the subscribers and from the attorney in fact, could become indebted, but, although on December 2, 1936, attorneys for the alleged bankrupt filed an application for an extension of time within which to file schedules, setting up therein "that the number of creditors of the bankrupt amounts to several thousand," and on the same day an order was made granting an extension of time within which to file schedules until December 11, 1936, no schedules have yet been filed (and no further extension of time has been granted within which to file them).