**R.S. MARTIN, Jr., Plaintiff-Appellant,**

v.

**KILGORE FIRST BANCORP, INC. and Kilgore First National Bank, Defendants-Appellees.**

**Nos. 83–2662, 84–2199.**

United States Court of Appeals, Fifth Circuit.

Dec. 7, 1984.

Rehearing Denied Jan. 7, 1985.

Charles H. Clark, Tyler, Tex., Joan Sprague, Dallas, Tex., for plaintiff-appellant.

Beth Fielding Siever, Austin, Tex., Richard Grainger, Tyler, Tex., for defendants-appellees.

Ronald R. Glancz, Eugene M. Katz, Washington, D.C., for amicus curiae—C.T. Conover, Comptroller.

Before CLARK, Chief Judge, JOHNSON, and WILLIAMS, Circuit Judges.

CLARK, Chief Judge:

Plaintiffs seek review of rulings of the district court (i) refusing to enjoin the sale of bank holding company stock to satisfy the requirements of 12 U.S.C. § 215(d), and (ii) denying a motion for summary judgment on their claim that the same section requires the auction of stock in a national banking association, rather than stock in a bank holding company chartered under state law. The district court certified the second question for interlocutory appeal as a controlling question of law pursuant to 28 U.S.C. § 1292(b).

We find that in the type of transaction at issue here the demands of section 215(d) are satisfied by the auction of stock in the bank holding company and affirm the district court.

## I

Plaintiffs were minority shareholders in Kilgore First National Bank (First National I). Sometime in 1980 or 1981 a majority of the board of directors of First National I decided to convert the bank's ownership from individual shareholders to a bank holding company. A reverse triangular merger was chosen to achieve the conversion. This type of merger has three phases: (1) the principals of an existing bank establish a bank holding company; (2) these same principals then apply to the appropriate authorities to charter an interim bank which is owned wholly by the holding company; and (3) the directors of both the original bank and the interim bank agree to merge or consolidate the two banks, subject to the approval of the Comptroller of the Currency (Comptroller), thereby forming the surviving bank. In this type of merger or consolidation agreement, shareholders of the existing bank exchange their shares for shares in the holding company.

Dissenting shareholders of the existing bank are entitled to the protections afforded by 12 U.S.C. § 215(d); they must be paid the appraised value of the shares they formerly owned and receive any excess over that value generated by an auction of the shares of the consolidated banking association which they would have received but for their dissent. The nondissenting shareholders of the original bank become the owners of all stock in the holding company, which in turn owns all of the stock of the surviving bank.

The board of First National I chose the reverse triangular merger method of changing ownership because of the tax advantages it offered. If the holding company acquired at least 80% of the stock in the surviving bank, the exchange would be tax free. Because 25% of the shareholders in First National I indicated they would dissent from the consolidation plan, the exchange would have been fully taxable if a traditional tender offer had been used. The reverse triangular merger enabled the board to eliminate the dissenters so that the bank holding company would be able to acquire all the stock in the surviving bank, and avoid any tax liability on the exchange for the shareholders.

To implement the reverse triangular merger, a majority of the directors applied to the Federal Reserve Board for prior approval of the formation of a bank holding company. On July 20, 1981 these same directors formed a Texas corporation, Kilgore First Bancorp, Inc. (Bancorp) for the express purpose of acquiring and holding all the outstanding stock of the surviving bank. The directors then secured a charter for an interim or "phantom" bank, New Kilgore First State Bank (First State), from the Commissioner of the Texas Banking Department on May 18, 1982. First State was formed only to serve the interim function of a controlled subsidiary needed to execute the reverse triangular merger. The Federal Reserve Bank of Dallas approved Bancorp's application to become a bank holding company on January 19, 1982.

The directors presented their plan of consolidation to the shareholders of First National I in a proxy statement that was accompanied by a prospectus of Bancorp on

September 30, 1982. The Federal Deposit Insurance Corporation and the Comptroller approved the consolidation five days later.

Plaintiffs voted against the consolidation at the October 22 meeting, thereby becoming dissenting shareholders within the provisions of 12 U.S.C. § 215(b)–(d), which governs the consolidation of national or state banks with national banks. On March 16, 1983 the Comptroller, pursuant to section 215(d), gave notice of his intent to cause an appraisal of the shares of First National I held by the dissenters. These individuals were later paid the appraised value of their First National I stock which was $279.69 per share. Bancorp subsequently scheduled a public auction of its stock to comply with the second potential payment requirement of section 215(d).

Prior to the auction date plaintiffs filed suit against Bancorp and the surviving bank, Kilgore First National Bank (First National II), challenging the results of the Comptroller's appraisal, as well as the propriety of his action in making the appraisal at all. They also sought a temporary restraining order and a preliminary injunction to stop the scheduled auction of Bancorp stock, contending that section 215(d) required the auction of First National II stock.

The district court granted the temporary restraining order against the auction on July 26, 1983, but on November 22, 1983, the court denied the requested preliminary injunction and dissolved the temporary restraining order. Plaintiffs appealed that order to this court.

Bancorp chose not to proceed with the sale. Plaintiffs later moved for partial summary judgment on their claim that section 215(d) required the auction of First National II stock instead of Bancorp shares. The district court certified to this court its denial of the motion. Plaintiffs filed this appeal based on that certification which we have accepted. 28 U.S.C. § 1292(b).

## II

The only issue before us is the application of the following portion of 12 U.S.C. § 215(d) to the consolidation described in Part I of this opinion.

Within thirty days after payment has been made to all dissenting shareholders as provided for in this section the shares of stock of the consolidated banking association which would have been delivered to such dissenting shareholders had they not requested payment shall be sold by the consolidated banking association at an advertised public auction .... If the shares are sold at public auction at a price greater than the amount paid to the dissenting shareholders the excess in such sale price shall be paid to such shareholders.

Our resolution of this question necessarily will dispose of plaintiffs' appeal from the denial of their request for a preliminary injunction against the sale of Bancorp stock.

### A

Plaintiffs maintain that the reorganization should be viewed as involving two steps: (1) the consolidation of First National I and First State into First National II and (2) the exchange of First National II shares for Bancorp shares. They insist that they dissented to the first step, the consolidation. Bancorp was not involved in this part of the transaction. According to their argument, if the plaintiffs had not dissented at this point, they would have received shares in the surviving bank, First National II, not Bancorp. Therefore, section 215(d) requires the auction of First National II shares, not stock in Bancorp. Moreover, they contend, the statute requires auction of the shares of a national "consolidated banking association." Bancorp, they point out, is a Texas corporation, not a national banking association.

Defendants reply that the reorganization, as set forth in the Agreement and Plan of Consolidation approved by the majority of shareholders in First National I and by the Comptroller, was a one-step transaction: shareholders of First National I tendered their stock in exchange for Ban-

corp shares. They admit that Bancorp is not a national banking association as described in the statute, but urge us to focus instead on the later phrase "[shares] which would have been delivered to such dissenting shareholders had they not requested payment . . . ." Those shareholders who did not dissent to this transaction received Bancorp shares.

There is no basis in fact for plaintiffs' claim that they would have received First National II stock but for their dissent. No shares in First National II were ever issued. Ordering the issuance and auction of First National II stock would not only ignore the realities of the transaction legally chosen by the majority stockholders, but would also defeat section 215's purpose. That purpose is to ensure that dissenters realize the same economic benefits as non-dissenters. Restructuring the real transaction could give dissenters a windfall since stock in the surviving bank may often be more valuable than holding company stock. Defendants claim it is here.

The Comptroller, who appeared *amicus curiae* during the district court proceedings and on appeal, urges the adoption of the construction advanced by defendants.

### B

We reject plaintiffs' request to characterize the reorganization as a two-step transaction. The Agreement and Plan of Consolidation clearly provides one step: the exchange of First National I stock for Bancorp shares. Plaintiffs' argument would be feasible only if the agreement had provided for the exchange of First National I shares for those of First National II and then a separate exchange of the First National II shares for Bancorp stock.

Undeniably, the plain language of section 215(d) is ambiguous, if not internally contradictory, when applied to a reverse triangular merger. As plaintiffs point out, the statute requires auction of the stock of a consolidated national banking association and Bancorp is not such an organization. Defendants, however, are equally correct in their assertion that the statute requires

auction of the shares the dissenters would have received if they had not dissented. In this case plaintiffs would have received Bancorp stock as did the shareholders who did not dissent. Their claim that they would have received shares in First National II but for their dissent is without merit because no such shares were ever issued.

The ambiguity in the statute is the result of changes in the forms of entities now used to conduct banking business. Reverse triangular mergers, using an interim or "phantom" bank to transfer ownership of a national bank to a one-bank holding company, were not devised until the mid-1960's. Section 215(d) was enacted in 1918 and last amended in 1959. Congress has not further modified the statute to accommodate newly developed merger mechanisms such as that presented here despite the fact that the Comptroller and the Federal Reserve System have consistently recognized the use of these new business forms and merger procedures.

### C

Regardless of the age of the ambiguity, our duty is to interpret the words of the statute to further the purpose Congress sought to accomplish by its enactment. *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 103 S.Ct. 986, 994, 74 L.Ed.2d 845 (1983); *WTWV, Inc. v. National Football League*, 678 F.2d 142, 143 (11th Cir.1982). Because the Comptroller has the primary responsibility for regulating consolidations involving national banks, we will accord substantial deference to his interpretation of section 215(d) where it represents a reasonable construction of the language and is consistent with the legislative intent. *See Securities Industry Association v. Board of Governors*, — U.S. —, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107 (1984).

Section 215(d) was enacted to protect the dissenting stockholders in a consolidation involving a national bank by providing a means whereby the dissenters would receive full value for their stock. *Central-Penn National Bank v. Portner*, 201 F.2d

607, 609 (3d Cir.1953) (citing H.R.Rep. No. 408, 65th Cong., 2d Sess. (1918); S.Rep. No. 406, 65th Cong., 2d Sess. (1918)). Congress intended to ensure that the dissenters would receive the same economic benefits as nondissenting shareholders.

The auction of Bancorp shares will place these plaintiffs in a position as nearly equal to that of the nondissenting shareholders as their dissent will permit. The nondissenters holding stock in First National I were never given the option of receiving First National II stock instead of Bancorp shares. If the dissenters are permitted to force the auction of First National II shares they could receive an economic return different from that realized by the nondissenters who could only own stock in a different concern. As the Comptroller notes, shares of First National II could be more valuable than Bancorp shares because individual ownership of some shares of First National II would give the owners disproportionate leverage in management. Such stock might also have a premium value because of its attractiveness to a multibank holding company seeking to take over First National II.

At oral argument plaintiffs contended that even if the First National II shares are more valuable than the Bancorp shares received by the nondissenters, this does not represent a windfall to the dissenters. It only ensures they receive the full value of their First National I shares as intended by section 215(d). However, that is not the purpose of the auction provision. The appraisal process established in section 215(d) protects plaintiffs' right to receive the full value of their First National I shares. The adequacy of their compensation for those shares is a function of the appraisal process. That process should not be confused with the separate statutory requirement to auction the stock of Bancorp which was received by the nondissenters.

The auction step is designed to secure to the dissenters the same economic benefits as the nondissenters realize from the consolidation transaction. To allow plaintiffs to force the issuance and auction of stock to which the nondissenters did not have access could allow plaintiffs to realize a greater profit from the transaction than the nondissenters. This could destroy the parity intended by the statute.

Accepting plaintiffs' contention that the auction of First National II shares was required because Bancorp is not a consolidated national banking association would not advance the purposes of the statute. Such a construction would produce an unreasonable result which is "plainly at variance with the policy of the legislation as a whole ...." *United States v. Mendoza*, 565 F.2d 1285, 1288–89, *modified on other grounds*, 581 F.2d 89 (5th Cir.1978) (en banc) (quoting *Perry v. Commerce Loan Co.*, 383 U.S. 392, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966)). The court would be required to order the issuance of First National II stock for the auction, despite the fact that the agreement did not provide for the issuance of such stock. The reverse triangular merger plan adopted by the majority of the shareholders in First National I to convert the bank to holding company ownership while avoiding tax liabilities was a legitimate transaction. Ignoring it could give plaintiffs a windfall. We refuse to follow this course.

### III

The legislative intent which produced section 215(d) is best served by construing its terms to require the auction of stock in the bank holding company and not of the surviving bank in a reverse triangular merger. The orders of the district court are

AFFIRMED.