**Armando GONZALEZ,**
**Plaintiff-Appellant,**

v.

**SOUTHERN PACIFIC TRANSPORTA-**
**TION COMPANY,**
**Defendant-Appellee.**

**No. 84–1149.**

United States Court of Appeals,
Fifth Circuit.

March 28, 1985.

Robert Madden Hill, Circuit Judge, dissented and filed opinion.

Michael D. Cucullu, Houston, Tex., for plaintiff-appellant.

Dan C. Dargene, Charles C. High, Jr., El Paso, Tex., for defendant-appellee.

Before RUBIN, TATE, and HILL, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

It is a criminal offense under the Federal Employers' Liability Act[1] to discipline any person for voluntarily furnishing information to a "person in interest" about the facts incident to an injury to an employee. Moreover, an employee who furnishes information about an injury to an FELA plaintiff or his lawyer may obtain injunctive relief without exhausting administrative remedies if his employer discharges him for furnishing such information.[2] The issue is whether an employee may obtain injunctive relief without exhausting administrative remedies when a railroad discharges him for filing an alleged false accident report with the railroad itself. We conclude that such an employee is entitled to a judicial determination whether he knowingly filed a false report and is not protected by the Act or whether he supplied information believed by him to be true and is protected. If the report is not shown to be deliberately deceitful, the employee is entitled to job-protection by injunction. We remand the case for a factual

---

**1.** 45 U.S.C. § 60.

**2.** *Hendley v. Central of Georgia R.R. Co.,* 609 F.2d 1146, 1152 (5th Cir.), *reh'g denied,* 614 F.2d 294 (5th Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981).

determination concerning the accuracy of the statements in the report, the employee's belief in their truthfulness, and his intention in filing it.

After a doctor diagnosed a railroad employee's health problem, on August 22, 1983, as a hernia requiring surgical repair, the employee filed a belated report of an on-the-job injury that supposedly occurred on August 15. Armando Gonzalez, a fellow employee, was not at work on August 15, but he filed a report of the claimed accident that suggests, if it does not assert, that he witnessed it.[3] After a company-investigation hearing, the railroad concluded that Gonzalez's report was false and discharged him for dishonesty. In accordance with the collective bargaining agreement between the railroad and his union, Gonzalez filed a grievance seeking reinstatement and back pay. The grievance is now at the management appeals stage, and Gonzalez has not exhausted his administrative remedies under the Railway Labor Act.[4] Gonzalez also sought a preliminary injunction, which was denied by the district court,

based primarily on its conclusion that § 60 of the FELA[5] does not create an implied cause of action for injunctive relief in these circumstances.

The statute, the full text of which is set forth in the footnote,[6] provides in relevant part:

"Any ... rule ... or device whatsoever, the ... effect of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void...."

In *Hendley v. Central of Georgia Railroad Co.*,[7] we held that § 60 protects an employee from formal investigation and discharge or loss of pay after reinstatement for assisting in the investigation of an injury to a fellow employee and giving a deposition to be used in the fellow employee's case.[8] Specifically, we stated that, "[i]f an employee can show that the object of a railroad's investigation is to discipline the employee for furnishing information in an FELA case, ... injunctive relief by a

---

**3.** For example, in response to the form inquiry on the accident report, "Where were you when accident occurred," Gonzalez replied, "Right next to his unit 2673 on unit." Gonzalez's other answers on the form, however, lend support to his claim that he did not falsify his statement, but merely misunderstood the responses called for by the form. For example, in response to the inquiry, "State how the accident occurred," Gonzalez replied that the injured employee "was working by himself" and that on a later date the employee "was working ... by himself again, [and] that's when he ask [*sic*] me ... to see if I could feel something in his right side, under the right hand shirt pocket, and I could feel a small bump." The injured employee's accident report contains the same ambiguity, listing Gonzalez as a witness but stating that, when the accident occurred, the employee was "working alone on unit."

**4.** *See* 45 U.S.C. § 153 First (i); *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 324–25, 92 S.Ct. 1562, 1565–66, 32 L.Ed.2d 95, 99–100 (1972).

**5.** 45 U.S.C. § 60.

**6.** 45 U.S.C. § 60 reads:
Any contract, rule, regulation, or device whatsoever, the purpose, intent, or effect of which shall be to prevent employees of any common

carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void, and whoever, by threat, intimidation, order, rule, contract, regulation, or device whatsoever, shall attempt to prevent any person from furnishing voluntarily such information to a person in interest, or whoever discharges or otherwise disciplines or attempts to discipline any employee for furnishing voluntarily such information to a person in interest, shall, upon conviction thereof, be punished by a fine of not more than $1,000 or imprisoned for not more than one year, or by both such fine and imprisonment, for each offense; *Provided,* That nothing herein contained shall be construed to void any contract, rule, or regulation with respect to any information contained in the files of the carrier, or other privileged or confidential reports.

**7.** 609 F.2d 1146, 1152 (5th Cir.), *reh'g denied,* 614 F.2d 294 (5th Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981).

**8.** *Id.* at 1153; *see also Stark v. Burlington Northern, Inc.*, 538 F.Supp. 1061, 1063 (D.Colo.1982) (enjoining railroad from discharging employee who made inquiries to the police and fellow workers to provide lawyer of deceased fellow employee with information).

federal district court is 'appropriate if not compelled,'" and that "a district court's ability to enjoin a hearing or conduct which violates § 60 is essential to effectuate the purpose of the section."[9]

As we interpreted § 60 in *Hendley,* its purpose is to prohibit the "overwhelming coercive effect" that disciplinary actions by railroads have on an employee's willingness to testify in an FELA case, notwithstanding the availability of grievance procedures that might later remedy the specific disciplinary action taken against the employee:

> Employees who consider testifying in an FELA case will understandably hesitate if they know that they may be forced, as Hendley was, to undergo a formal investigation and possibly suspension for a lengthy period of time. The fact that the employee may ultimately prevail is of little assurance to one who faces possible unemployment for a year or more. Thus, the disciplinary procedure not only violates the mandate that an employer refrain from disciplining an employee for furnishing information, it also becomes a device the "effect of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest."[10]

Had Gonzalez given a deposition to the injured employee's lawyer, therefore, there would be no question that he could invoke the protection of § 60. Nevertheless, the railroad contends that the prohibition against disciplining an employee for furnishing information to a "person in interest" was meant to cover and in fact covers only cases in which employees furnish information to injured fellow employees or their representatives and not a case like Gonzalez's, in which the employee furnishes information to the railroad itself.

The statutory prohibition, however, is not limited to protection for those who furnish information to "employees," or "employee's representatives." It extends to statements made to "a person in interest" (the words being thrice repeated). The railroad itself is certainly a person in interest, but it urges us to substitute our reading of Congress' purpose for the language of the statute. We decline the invitation to substitute our divination of congressional intent for the words Congress chose to use.

If a statute is not clear, resort to legislative history is the long-sanctioned method of seeking the statute's meaning.[11] While this process is referred to as "seeking the intent of Congress," it does not attempt to probe retroactively the collective mind of a majority of the Senate, the House, and of the President, who signed the bill thus making it law, but is an aid to clarification of the words used. Nevertheless, "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary common meaning."[12] Moreover, "[a]bsent a clearly expressed legislative intent to the contrary, that [statutory] language must ordinarily be regarded as conclusive."[13] While we recognize that, "[w]hen aid to construction of the meaning of words, as used in the statute, is avail-

---

**9.** *Id.* at 1152 (quoting *Brotherhood of R.R. Trainmen v. Central of Ga. Ry. Co.,* 305 F.2d 605, 609 (5th Cir.1962)).

**10.** *Id.* at 1152–53 (quoting 45 U.S.C. § 60).

**11.** *See, e.g., Allen v. State Bd. of Elections,* 393 U.S. 544, 570, 89 S.Ct. 817, 834, 22 L.Ed.2d 1, 19 (1969); *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 184, 87 S.Ct. 2001, 2008, 18 L.Ed.2d 1123, 1129 (1967); *United States v. Noe,* 634 F.2d 860, 861 (5th Cir.), *cert. denied,* 454 U.S. 876, 102 S.Ct. 355, 70 L.Ed.2d 186 (1981); *see also United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345, 1351–52 (1940).

**12.** *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199, 204 (1979); *see also United States v. Apfelbaum,* 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980); *Quarles v. St. Clair,* 711 F.2d 691, 699 n. 21 (5th Cir.1983).

**13.** *Consumer Prods. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766, 772 (1980). *See also Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973, 980 (1982).

able, there certainly can be no 'rule of law' which forbids its use," [14] "[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." [15] As the Supreme Court has recently stated, "[w]hen confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to the legislative history as a guide to its meaning .... Here it is not necessary to look beyond the words of the statute." [16] We, therefore, decline to substitute the word "employee" when Congress repeatedly used "person in interest."

▇ When a railroad employee is injured without the intervention of a third person, there are only two persons in interest: the employee and the railroad. If the employee dies, the representatives of his estate become persons in interest.[17] But the railroad remains the other person in interest. We cannot, therefore, read the statutory phrase as if it said less than it does. Surely Congress knew how to use, and in the statute artfully did use, the word "employee" when it meant employee. The statutory language, therefore, clearly covers an employee's submission of an accident report to the railroad.

▇ Moreover, the purpose of § 60, as set out in *Hendley,* is to eliminate "the danger that railroad agents would coerce or intimidate employees to prevent them from testifying," or to prevent their "furnishing information to an FELA plaintiff." [18] Thus, protection of testimonial activities of FELA witnesses, such as the filing of accident reports, not only is covered by the statutory language itself but also

"effectuate[s] the purpose of the section." [19]

Our dissenting brother finds the statute ambiguous and resorts to legislative reports for its true meaning. He concludes that "it is undeniable that the legislative history of § 60 is clear and unambiguous in its rejection of the majority's interpretation." While he accurately recounts part of the legislative history, these excerpts tell us clearly only that the statute, as originally drafted, did not contain the phrase, "person in interest," and was redrafted by members of Congress to exclude protection for disclosure to "ambulance chasers and shysters." The legislative history does not tell us anything about whether Congress intended to protect those who disclose information to employers, and the original language, in fact, seems to have been broad enough to protect those who give information to employers.

The language used in the Congressional reports is no more precise than the language in the statute. Some of it might be cited in support of our interpretation of "person in interest." [20] Our brother agrees with us that the extent of protection under § 60 turns on the interpretation of the phrase "person in interest." We also seem to agree that Congress simply did not address the problem that we face although the dissent considers that, "[e]mployer entitlement to accurate information was ... assumed." Our disagreement turns on the appropriate methodology for resolving the meaning of the words used in the statute.[21]

Like all other historical accounts, legislative chronicles do not tell a single tale, and, therefore, resort to the language of the

**14.** *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345, 1351 (1940).

**15.** *Id.* at 543, 60 S.Ct. at 1063, 84 L.Ed. at 1351.

**16.** *TVA v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117, 140 n. 29 (1978) (citation and emphasis omitted); *see also United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575, 579 (1961); *Ex parte Collett,* 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207, 1211 (1949).

**17.** 45 U.S.C. § 51; *see also* 45 U.S.C. § 59.

**18.** 609 F.2d 1146, 1150–51 (5th Cir.1980).

**19.** *Id.* at 1152.

**20.** See, for example, text accompanying notes 5 and 7 of the dissent.

**21.** *See generally* R. Dworkin, Taking Rights Seriously 105–10 (1977).

statute is not only the first but the safest course.[22] We have held to this course before: "The most obvious place to find congressional intent is in the statute."[23]

The purpose of the statute is to protect employees who supply information to help FELA claimants. That purpose is served by the result we reach,[24] and those employees who knowingly supply false information are not protected. It also is more readily administered. The very employees who supply FELA plaintiffs with information may also be required to file accident reports with their employers. If only furnishing information to employees is protected, an employer might discharge an employee for doing so under the pretext that the discharge is for filing the accident report with the employer. The interpretation reached by our brother, therefore, would create the possibility that employers might subvert the purposes of § 60 in such cases or at least create another judicial issue: whether a discharge was in truth for one reason or the other.

The railroad's reliance on two circuit court opinions that have refused to expand the protection of § 60 is misplaced. Neither is applicable here because neither involved the furnishing of information to a person in interest. In *Jackson v. Consolidated Rail Corp.*,[25] the Seventh Circuit held that a FELA plaintiff who was allegedly discharged in retaliation for bringing an FELA suit against his employer was not protected by § 60. The court recognized that there was some "superficial appeal" in the plaintiff's reliance on the policy behind § 60, but found that it could not expand the scope of the section without some specific statutory language to support such an expansion. The court found,

therefore, that the mandatory grievance procedures under the Railway Labor Act preempted the court's jurisdiction. In Lanfried v. Terminal Railroad Association,[26] the Eighth Circuit likewise refused to extend § 60 to protect an employee against discharge in alleged retaliation for bringing an FELA suit against his employer. These are, therefore, not furnishing-information cases.

█ The railroad also contends, however, that it has not enforced a rule against or discharged an employee for furnishing information, but has instead acted to enforce a rule that prohibits the filing of required reports that are false. We agree that the Act was not designed to protect FELA witnesses if they deliberately give information known by them to be false and that nothing in its language compels a contrary conclusion. As we stated in *Hendley*, our interpretation of § 60 does not mean that "an employee may never be disciplined for his conduct in connection with an FELA case."[27] If Gonzalez lied in the accident report, § 60 presents no barrier to his discharge. If he filed a report that was true or, while untrue, he believed to be true, he is entitled to § 60 protection.

The district court did not determine whether Gonzalez's statements in the accident report were true or false, but held that this question was "beside the point" since it found that § 60 was not applicable "in any way." It also held that, even if § 60 was applicable, Gonzalez was not entitled to injunctive relief because he had not shown that there was a substantial threat of irreparable harm.

█ Ordinarily a plaintiff must show a substantial threat of irreparable harm in

---

22. *See, e.g., Johnson v. American Airlines, Inc.,* 745 F.2d 988, 993 (5th Cir.1984).

23. *Id.*

24. *See, e.g., Martin v. Kilgore First Bancorp, Inc.,* 747 F.2d 1024, 1027 (5th Cir.1984) ("Regardless of the age of the ambiguity, our duty is to interpret the words of the statute to further the purpose Congress sought to accomplish by its enactment.").

25. 717 F.2d 1045 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984).

26. 721 F.2d 254 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984).

27. 609 F.2d at 1153.

order to obtain injunctive relief.[28] The rationale of *Hendley*, however, is that a district court should grant injunctive relief if an employee shows that he has been discharged for furnishing information to an interested person. The harm to be prevented by this remedy is not the employee's loss of employment or pay, which may or may not be recovered by him through the grievance process, but coercion of FELA witnesses, which, if allowed to flourish, would undercut the Act. The district court erred, therefore, when it required Gonzalez to show any further injury beyond discharge for furnishing information to an interested party.

The key issue remains: was Gonzalez's conduct of the kind shielded by § 60? We, therefore, remand to the district court for a determination of whether Gonzalez filed an accident report known by him to be false with the intention to deceive the railroad. We phrase the issue in this way to make clear that to "effectuate the purpose of the section," an FELA witness who files an accident report that, to the best of his knowledge, is true should not be denied the protection of § 60 if it proves to be inaccurate or incorrect.

■, ■ This resolution is not inconsistent with the exclusive jurisdiction of the grievance procedures under the Railway Labor Act.[29] "The question of whether a particular disciplinary [action] violates § 60 involves interpretation of a federal statute, and is, therefore, a matter of federal jurisdiction.... This is a matter properly within the jurisdiction of the federal courts and is not a question to be determined by the administrative board."[30] Should the district court on remand determine that Gonzalez is protected by § 60, he would be entitled to reinstatement and "full back pay for the time that he was suspended or

unemployed as a result of the railroad's actions."[31] "Since [Gonzalez's] actions could not lawfully be the subject of disciplinary action and arbitration, any award made by the National Railroad Adjustment Board [other than full reinstatement and back pay would be] null and void."[32] Should the district court determine on remand, however, that Gonzalez knowingly filed a false accident report, it should deny injunctive relief. Gonzalez may then pursue his grievance through administrative channels and attempt to show that the disciplinary action taken by the railroad violates the collective bargaining agreement, either because it is too harsh or for some other reason. We make no decision on this issue, and leave its determination to the Board, which has exclusive jurisdiction over disputes concerning the application of collective bargaining agreements.

For these reasons, the case is REVERSED and REMANDED for proceedings consistent with this opinion.

ROBERT MADDEN HILL, dissenting:

The majority today holds that an employer covered by the Federal Employers' Liability Act is a "person in interest" under § 10 of that Act, 45 U.S.C. § 60. I have no quarrel with the desired purpose of the majority's holding: protecting FELA plaintiffs from coercive or retaliatory actions by employers who desire to stem the flow of useful information relating to their own liability. My disagreement is with the majority's method of reaching the holding. Moreover, I think the important protective function of the holding has been adequately provided for by procedures other than those available under § 60. For these reasons, I respectfully dissent.

---

28. *See Commonwealth Life Ins. Co. v. Neal,* 669 F.2d 300, 303 (5th Cir.1982); *Southern Monorail Co. v. Robbins & Myers, Inc.,* 666 F.2d 185, 186 (5th Cir.1982).

29. *See* 45 U.S.C. § 153 First (i); *Andrews v. Louisville & Nashville R.R. Co.,* 406 U.S. 320, 324–25, 92 S.Ct. 1562, 1565–66, 32 L.Ed.2d 95, 99 (1972).

30. *Hendley,* 609 F.2d at 1151.

31. *Id.* at 1153.

32. *Id.*

## I.

The main impetus behind my dissent is the clarity of the legislative history surrounding the passage of § 60 in general and the addition of the "person in interest" language, specifically. It is seldom possible for courts to be confident that the various sources for legislative history support a certain proposition. Like statistics, legislative history can often be used to prove anything the researcher desires to assert. This, I think, is one of the silent concerns that the majority seeks to address in its opinion. This concern is not, however, applicable to the issue before us today.

Section 60 was added to the FELA in 1939.[1] It was a response to the widely observed railroad company policy, often embodied in company rules, of penalizing employees for reporting information concerning accidents on the lines.[2] The rules usually prohibited employees, under penalty of discharge, from reporting such information to anyone except the company itself.[3] In fact, each of the ten rules used as an example by the sponsor of the amendment at the Senate hearing made an explicit exception for information furnished to the railroad company itself.[4] While less than noble, the reason for the rule and its exception is obvious and logical: in the adversarial context of FELA litigation, the railroad companies desired to deny pertinent information to all but their own lawyers and representatives. In § 60, Congress attempted to end this practice and equalize access to such information, recognizing that, "[i]n relation to the investigation of facts upon which claims for injuries are based, humanity and justice demand that injured railroad men be accorded as much freedom of action as their employers enjoy."[5] Employer entitlement to accurate information was thus assumed and the amendment was passed in order to "permit those who have information concerning the facts and circumstances of a personal injury to give statements to the injured employee or his dependents, or to someone authorized to represent him or them."[6]

As first proposed, the amendment contained no "person in interest" phrase at all, the pertinent text providing as follows:

> Any ... device whatsoever, the purpose, intent or effect of which shall be to prevent employees of any common carrier from furnishing information as to the facts incident to the injury or death of any employee, shall be void....[7]

The railroad companys objected to the absence of a referent for the phrase "furnishing information" but only because it would encourage investigations by so-called "ambulance chasers and shysters."[8] The proponent of the bill therefore proposed the "person in interest" phrase at the Senate Hearing expressly for the purpose of denying information to such person.[9] The Senate committee adopted the amendment adding the language "to a person in interest or his representative" at the proper place.[10] It then reported the bill to the full Senate stating, as an objective of the bill, that "[i]t prohibits the promulgation or enforcement of rules which penalize railroad employees for giving information concerning accidents

1. S. 1708, 76th Cong., 1st Sess. (1939).

2. *Amending the Federal Employers' Liability Act: Hearing on S. 1708 Before the Subcomm. of the Committee on the Judiciary*, 76th Cong., 1st Sess. 1, 20–22 (1939) (statement of T.J. McGrath, general counsel, Brotherhood of Railroad Trainmen) (hereinafter referred to as *Senate Subcomm. Hearing on S. 1708*).

3. *Id.* at 21–22.

4. *Id.*

5. S.Rep. No. 661, 76th Cong., 1st Sess. 1, 5 (1939).

6. *Id.*

7. *Senate Subcomm. Hearing on S. 1708, supra* note 2, at 2.

8. *Senate Subcomm. Hearing on S. 1708, supra* note 2, at 39–43 (statement of F.M. Rivinus, general counsel, Norfolk & Western Railroad).

9. *Id.* at 23 (statement of W.T. McGrath).

10. S.Rep. No. 661, 76th Cong., 1st Sess. 1, 2 (1939).

*to the injured person or his representative."* [11] Specifically addressing the purpose of the "person in interest" phrase, the committee stated, "[t]he amendment fully protects the employer against abuses which might result from so-called ambulance chasing." [12]

The House Committee on the Judiciary which reported the bill favorably to the full House after deleting the words "or his representative," was even more precise in its definition of the phrase. It stated:

It is not a bill for the benefit of ambulance chasers. The language is carefully limited to make its provisions applicable with reference to the giving of information only to a person in interest. Section 1 of the Employers' Liability Act designates persons who are entitled to recover under the act under certain circumstances. These include the employee, and his or her personal representative for the benefit of the surviving spouse, children, and next of kin. The committee takes the language "a person in interest" as meaning a person entitled under section 1 to maintain an action or to recover damages as a result of the injury or death.[13]

Without belaboring the point, I conclude by saying there is not a shred of evidence in the legislative history that Congress, or any member thereof, intended that employer railroad companies be considered "person[s] in interest." In fact, all the evidence compels the inescapable conclusion that Congress never contemplated the problem before us and could not have intended the language to mean what the majority holds it does.

The majority states that "Congress knew how to use, and in the statute artfully did use, the word 'employee' when it meant employee." [14] This does not, of course, mean that Congress artfully used the phrase "person in interest." The reason Congress did not merely substitute the word "employee" for the phrase was, as the majority recognizes, because § 60 was clearly intended to protect those who give information to the injured employee's legal or personal representative as well as to the employee himself. Neither I nor any party to this appeal has invited the majority to limit the scope of the phrase to the class of employee's only; all concede that the phrase includes also the class of employee representatives. Yet the inclusion of this latter class does not necessitate the inclusion of the class comprising employer railroad companies. The legislative history, in fact, demonstrates that Congress excluded this class. If my argument leads to the conclusion that Congress used "person in interest" inartfully and that it should have used some other more narrow term, it will not be the first time a court has so concluded. But it is indefensible to conclude that the usage was artful without first examining the legislative history.

II.

Thus, I think it undeniable that the legislative history of § 60 is clear and unambiguous in its rejection of the majority's interpretation. I dissent because the majority's approach makes this undeniable fact irrelevant. Stating that the meaning of § 60 is clear on its face, the majority declines to examine the historical context surrounding its adoption. Given the authority cited in support of this approach I have grave doubts concerning its validity. Moreover, I think the language unambiguous neither on its face nor in the context in which we are asked to apply it here.

---

11. *Id.* at 2. (emphasis added).

12. *Id.* at 5.

13. H.R.Rep. No. 1422, 76th Cong., 1st Sess. 1, 2 (1939).

14. Concerning this statement, I have one observation: I am quite uncertain how the majority could know when Congress was being artful in its use of the term "employee" without appealing to some evidence extrinsic to the text of the statute itself. Surely, precision of usage is rarely obvious from the text itself and just as surely Congress' own commentary upon its meaning is an excellent form of evidence of precision or artfulness.

## A.

The majority's approach to interpreting § 60 is founded on two principal propositions. First is the canon of construction that holds that "words will be interpreted as taking their ordinary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *see supra* majority opinion, text accompanying note 12. While undoubtedly useful as a point of departure, this canon has not been employed, at least in the cases cited by the majority, *see supra* majority opinion at note 12, to completely avoid examining legislative history. In each case cited by the majority as a source of the canon, the courts engaged, often at length, in an analysis of the legislative history either in determining, or in clarifying its determination of, ordinary meaning.[15]

To be sure, the majority proceeds to cite authority to support the rules, more critical in this context, that hold that statutory language may often be "regarded as conclusive," *see supra* majority opinion at note 13, and that a statute that is "plain and unambiguous on its face" will ordinarily be interpreted without reference to the legislative history. *See supra* majority opinion at note 16. Yet in each of these cases the courts also engaged in discussions or thorough analyses of legislative history either to interpret the relevant statute in the first instance,[16] or to rebut an interpretive position, expressed in a dissent[17] or by one of the parties,[18] that was based on an equivocal legislative history. The majority has not cited a single case in which a court has refused to search the legislative history for the meaning of statutory language merely because it believed the language to be unambiguous.[19] More than likely, this is due to the fact that the courts, taking cogni-

**15.** *See Perrin v. United States*, 444 U.S. at 41–45, 100 S.Ct. at 313–316; *United States v. Apfelbaum*, 445 U.S. at 121–23, 100 S.Ct. at 952–53; *Quarles v. St. Clair*, 711 F.2d at 700–05.

**16.** *See Consumer Prods. Safety Comm'n. v. GTE Sylvania, Inc.*, 447 U.S. at 110–16, 100 S.Ct. at 2057–60; *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. at 570–74, 102 S.Ct. at 3250–52.

**17.** *See TVA v. Hill*, 437 U.S. at 173–90, 98 S.Ct. at 2291–2300. After noting that in the case before it "it [was] not *necessary* to look beyond the words of the statute," the majority engaged in an exhaustive study of the legislative history in order to demonstrate the incorrectness of the dissent's protest that the majority's interpretation of the statute was at odds with the legislative history. *Id.* at 184 n. 29, 98 S.Ct. at 2296 n. 29 (emphasis in original).

**18.** *See United States v. Oregon*, 366 U.S. at 648, 81 S.Ct. at 1281; *Ex parte Collette*, 337 U.S. at 61–71, 69 S.Ct. at 947–953; *see also, Escondido Mut. Water Co. v. LaJolla Indians*, —— U.S. ——, ————, 104 S.Ct. 2105, 2110–14, 80 L.Ed.2d 753, 761–65 (1984); *United States v. Reeves*, 752 F.2d 995, 1000–01 (5th Cir.1985).

**19.** The majority characterizes its approach as a refusal "to substitute [the court's] divination of congressional intent for the words Congress chose to use," *see supra* majority opinion at 7, implying that its holding is somehow divorced from or above the interpretive process. This notion is, of course, unsound. What the majority has done in its interpretation of § 60 is to substitute its *divination* of "the words Congress chose to use" for its "divination of congressional intent." I merely ask that in cases such as this, the Court's reading of Congress' words be influenced and, if possible, clarified by its reading of the legislative history. The choice is not between an "interpretationless" reading of statutory language on the one hand and an interpretative reading of congressional intent on the other. It is, rather, between an interpretation of the language based solely on the biases and linguistic background of the judge on the one hand and, on the other, an interpretive reading of the language, with such biases minimized by an interpretation of legislative history. *See e.g., Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.Rptr. 561, 442 P.2d 641, 643–45 (Cal.1968) (Traynor, J., in discussing interpretation of contracts, wrote: "A rule that would limit the determination of the meaning of a written instrument to its four corners merely because it seems to the court to be clear and unambiguous, would ... presuppose a degree of verbal precision and stability our language has not attained."); *see also* Corbin, The Interpretation of Words and the Parol Evidence Rule, 50 Cornell L.Q. 161, 187 (1965) (A word has no meaning apart from "the verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges) ... much less does it have an objective meaning, one true meaning."). *See generally*, Symposium: Law and Literature, 60 Tex.L.Rev. 373–586 (1982). I merely ask that the Court seek every possible aid in performing its admittedly interpretive task.

zance of the proposition that the facial clarity of statutory language may be overridden by "clear expressions of legislative intent to the contrary," [20] have generally been loathe to refuse the offer of an aid to difficult problems of interpretation. To refuse it here is to go against precedent and common sense.

Of course, as demonstrated by the abbreviated discussion in part I, above, the historical context that gave rise to § 60, at the very least, introduces significant ambiguity into the interpretation of the "person in interest" phrase. Yet, this aside, I think the phrase is arguably ambiguous even on its face.

### B.

The majority's approach, assuming its validity, compels us to ask whether the "person in interest" phrase, divorced from its historical context, is clear and unambiguous on its face. In the absence of guiding principles for this threshold inquiry, I can only state that I think the phrase less clear than the majority does. For instance, is it clear, without examining the purposes for

its adoption,[21] that § 60 does not protect employees who give information to physicians or newspaper reporters or labor unions who are not interested in the information for litigious reasons? In short, the nature of the "interest" necessary to trigger protection under § 60 is not at all clear from the language alone.[22]

The "fundamental canon" that holds that, ordinarily, "words will be interpreted as taking their ordinary, common meaning," *Perrin v. United States*, 444 U.S. at 42, 100 S.Ct. at 314, is also of little help here. In the context of this appeal, we are invited, and the majority has agreed, to hold that a corporation is a "person in interest." Is it common for the word "person" to refer to a corporation? Would an ordinary "person-on-the-street" understand us to include corporations, associations or other purely legal entities when we say the word "person"? [23] I think not.[24] In the context of *legal* usage, perhaps.[25] Yet placing the language in the statutory or legal context, as the majority clearly does, is, at least, a departure from the literal terms of the cited canon of construction; inquiring more deeply into the statutory

20. *Escondido Mut. Water Co. v. LaJolla Indians*, — U.S. —, —, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753, 761 (1984).

21. To be sure, the majority does not claim to ignore entirely the purpose of § 60. It quotes this Circuit's estimation of that purpose made in *Hendley v. Central of Georgia Railroad*, 609 F.2d 1146, 1152–53 (5th Cir.1980). *See supra* majority opinion, text accompanying note 10. This underlying purpose, to prevent the "overwhelming coercive effect" of disciplinary actions by railroads, in fact, forms the foundation for the majority's holding. However, I do not know where our understanding of the purpose of § 60 originates if not from the history of FELA litigation generally and the legislative history of § 60 specifically. The majority's failure to cite legislative history does not change the fact that it is the primary source of our knowledge concerning the purpose of § 60. In view of this, then, the refusal to refer to legislative history as an aid in interpreting "person in interest" seems, at least, somewhat inconsistent.

22. Given that the ambiguity is so immediately apparent I do not intend, nor do I need, to go so far as Professor Corbin in his characterization of linguistic meaning. *See supra* note 19.

23. The Random House Dictionary of the English Language 1074 (unabridged ed. 1969) defines person as "a human being, whether man, woman, or child," and as "a human being as distinguished from an animal or a thing." This is surely the kind of source to which a layperson would go to determine the meaning of an unknown word. A layperson would only find corporations included in the *"Law"* definition of this entry. *Id.* at 1075.

24. The majority seems to recognize it is straining ordinary usage when it casually substitutes the word "party" for "person" in its discussion.

25. Even in legal usage, however, the meaning is susceptible to ambiguity. Thus, it has been held both that the word presumptively refers to "natural" persons only unless otherwise indicated, *see People v. McGreal*, 278 N.E.2d 504, 509, 4 Ill.App.3d 312 (1971); *Baker v. Kirschnek*, 176 A. 489, 491–92, 317 Pa. 225 (1935), and that the word presumptively includes "artificial" persons. *United States v. Fox*, 94 U.S. 315, 321, 4 Otto 315, 321, 24 L.Ed. 192 (1876); *In re Mfg. Lumbermen's Underwriters*, 18 F.Supp. 114, 123 (W.D.Mo.1936). In any event, legal usage cannot usually be appealed to for the "ordinary and common" meaning of a word.

context—by examining legislative history—is a slightly greater departure. Yet, for the sake of understanding and deference to the will of the legislative branch, both degrees of departure from the vague and indeterminate canon are justified.

Moreover, when, as in this appeal, we have been presented in the briefs with an interpretation, based on legislative history, that is unrebutted and at least superficially persuasive and that is dispositive of the principal issue, an examination of the legislative history is even more justified. However, just as "there ... can be no 'rule of law' which forbids [the] use" of legislative history, *United States v. American Trucking Associations*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940), it is a reasonable corollary that there can be no absolute rule *compelling* its use in certain situations. Thus, I do not intend here to articulate a new test or standard for determining when it is appropriate to use legislative history as an aid to interpretation. I merely opine that I am hard pressed to imagine a more appropriate case for its use than the present one.

In *United States v. American Trucking Association, supra,* cited and partially quoted by the majority, *see supra* majority opinion at note 14, Justice Reed discussed the contours of statutory interpretation by the courts, in the process referring to the responsibility and the danger inhering the task. He wrote:

When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively apprecia-

tion of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion. Emphasis should be laid, too, upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts. A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, "excepting as a different purpose is plainly shown."

310 U.S. at 543–44, 60 S.Ct. at 1063–64 (footnotes omitted). To my mind, at least part of Justice Reed's warning has gone unheeded today.

The ultimate problem with the majority's approach is that it renders irrelevant a readily accessible, often useful and, in this case, highly persuasive tool of interpretation. The resulting analysis, at least here, is truncated and the result at odds with legislative intent. In all cases in which statutory construction is necessary, this will not be so. Often the legislative history will be confused or just as ambiguous as the language of the statute. *See, e.g., TVA v. Hill*, 437 U.S. at 173–90, 98 S.Ct. at 2291–2300; *United States v. Oregon*, 366 U.S. at 648, 81 S.Ct. at 1281. But the majority's approach forecloses us, not only from using the tool of legislative history, but from even determining in the first instance whether the tool is useful or not; and, as noted above, does so with sparse precedent to legitimate it.

The effect of refusing at the threshold to even glance at the legislative history has here had the effect of elevating inartful draftsmanship to the level of precedent without so much as even a cursory inquiry into whether or not the draftsmanship is indeed inartful. The approach adopted has prevented a clear and unambiguous legislative history from clarifying what is arguably ambiguous language. I cannot concur in what appears to be an abdication of our responsibility to follow the expressed will of Congress, particularly when it results in injustice to concerned parties.

### III.

Again, the concern that motivates the majority's opinion is eminently legitimate; indeed, I share it. Specifically, we are concerned with the possibility that railroad companies could use the internal rule against filing false reports as a pretext to punish employees for filing reports or to discourage their being filed at all.[26] While I have concluded from the legislative history that this concern is not remedied by § 60, I think the grievance procedure provided for by the relevant collective bargaining agreement and enforced under the Railway Labor Act, 45 U.S.C. §§ 151–163, adequately addresses the fear that Gonzalez had been mistreated. The grievance procedure is the proper forum to determine whether or not Gonzalez's report was true and whether this discharge was excessively harsh or otherwise unfair.

I would therefore hold that since § 60 does not apply to information furnished by employees to employers, Gonzalez has failed to state a claim under § 60 and the district court was correct in dismissing his action.

---

**26.** Incidentally, there is no evidence in the record that the problem posed by Gonzalez's discharge is more than a unique and isolated circumstance. The majority's expansion of § 60 is thus not only questionable as a matter of statutory construction, it is arguably unnecessary to serve the perceived underlying preventive function.